IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32826-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHRISTOPHER MICHAEL TASKER II, | ) | OPINION PUBLISHED IN |
| | ) | PART |
| Appellant. | ) | |

SIDDOWAY, J. — Christopher Tasker appeals the sentence imposed for his

convictions of first degree kidnapping, attempted first degree robbery, and first degree

unlawful possession of a firearm. He challenges the sufficiency of the evidence to

support two firearm enhancements, the trial court's calculation of his offender score, and

its imposition of discretionary legal financial obligations (LFOs).

In the published portion of this opinion, we address his contention that there was

insufficient evidence to support the firearm enhancements imposed because the State

failed to present evidence that he possessed an operable firearm at the time of his crimes.

While the jury was required to find (and did) that Mr. Tasker possessed a real firearm, the

State was not required to produce further evidence that the firearm was operable at the

time of the crimes.

In the unpublished portion of this opinion, we address Mr. Tasker's contentions that the trial court abused its discretion in refusing to treat the first degree kidnapping and attempted first degree robbery as the same criminal conduct in calculating his offender score and that it erred or abused its discretion in imposing LFOs. We also address several issues raised by Mr. Tasker in a pro se statement of additional grounds. We exercise our discretion to review the LFO issue, remand with directions to strike the discretionary LFOs, and otherwise affirm.

FACTS AND PROCEDURAL BACKGROUND

On June 13, 2013, Gloria Campos-White was sitting in her parked car outside of Selah Intermediate School, waiting for her daughter's basketball practice to finish, when a man walked up to her open driver's side window, pointed a gun in her face, and demanded she give him her purse. She complied, telling him as she handed him the purse that she did not have any money.

After the man had her purse, he reached for the handle of the rear passenger door and after struggling with it for a moment, was able to get into the back seat, where he ordered Ms. Campos-White to drive. She would later testify that he still had the gun when he entered the car, and that although she did not see it again, "at one point when we were actually driving I thought I heard the clicking of something behind my head." Report of Proceedings (RP) at 430-31.

The man gave Ms. Campos-White directions as she drove, but he did not tell her where they were going. She recalls driving "up a curved hill" and that they traveled through orchards. RP at 433. But not being familiar with the Selah area, she did not know where they were. She believed that he was directing her to an undeveloped area, and that "there [was] nothing back there for him to be needing to take me up there." RP at 448.

Not knowing his intentions, Ms. Campos-White felt desperate to get away. Without slowing her car, she waited for a gap in oncoming traffic, unbuckled her seatbelt, opened the car door, and jumped out of the moving vehicle. With no one at the wheel, her car soon struck a bank on the side of the road and flipped on its side. Residents of a nearby home who heard the crash ran out to stop traffic and attend to Ms. Campos-White. They saw a man climb out of a passenger side door of her car and run off. In addition to cuts, bruises, and a sprained ankle, Ms. Campos-White sustained a severe concussion that led to the loss of her ability to taste or smell.

The man who abducted her was not found in the area, though a single shoe that did not belong to the Campos-White family was found near the hatchback of the car. No firearm was ever recovered.

Ultimately, based on video surveillance recorded by the Selah school, Ms. Campos-White's identification, and physical evidence recovered from the scene of the crash, Christopher Tasker was arrested and charged with first degree kidnapping,

3

attempted first degree robbery, and first degree unlawful possession of a firearm. The

State sought firearm enhancements in connection with both the first degree kidnapping

and the attempted first degree robbery charges.

At trial, Ms. Campos-White identified Mr. Tasker as the man who kidnapped and

attempted to rob her. She described the gun that Mr. Tasker used, explaining it was a

dark color and small enough to be held with one hand. She admitted during the State's

examination that she did not know much about guns or firearms, and testified that she had

"never seen a gun in real life." RP at 451. She also admitted that she would not know

the difference between a revolver and semiautomatic handgun by name, but knew that

they looked different. She never wavered from her testimony that Mr. Tasker had been

armed with a gun, however. Asked on cross-examination whether there was "[a]ny

chance it could've been anything besides a handgun," she answered, "No." RP at 452.

At the close of the State's case, Mr. Tasker moved to dismiss the request for

firearm enhancements and the charge of unlawful possession of a firearm. Relying on

two decisions of the Washington Supreme Court and one of Division Two of our court,[1]

he argued that the State was required, but failed, to prove the firearm testified to by Ms.

---

[1] *State v. Recuenco*, 163 Wn.2d 428, 180 P.3d 1276 (2008); *State v. Pam*, 98 Wn.2d 748, 659 P.2d 454 (1983), *overruled on other grounds by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013 (1989); *State v. Pierce*, 155 Wn. App. 701, 230 P.3d 237 (2010).

Campos-White was operable. The trial court reserved ruling, explaining that if the jury answered yes to the firearm special verdicts, it would hear further from Mr. Tasker.

The defense devoted its entire closing argument to urging the jury that there was reasonable doubt whether Mr. Tasker had been armed with a real firearm. It emphasized Ms. Campos-White's nonspecific description of the gun, her inexperience with firearms, and an asserted hesitancy in her testimony. It also told the jury that the purpose of the special verdicts they were being asked to complete was because the State wanted "more" than just conviction of the crimes and was "asking for more than they can prove." RP at 760. The jury nonetheless answered yes to the special verdicts asking whether Mr. Tasker was armed with a "firearm" as defined by Washington law, in addition to finding Mr. Tasker guilty of the crimes charged. Clerk's Papers (CP) at 41, 43.

In a hearing on a posttrial motion to set aside the jury's verdict on the firearm possession findings, the trial court informed the parties that it had concluded after reading cases cited by the parties that Division Two of the Court of Appeals "seems to focus more on the question of has the prosecution proven that the gun was operable," Division One "appears to focus more on the question of was the gun real," a "slightly different question[,]" and, "[u]nfortunately, there are no cases from Division [Three]. I have no idea what Division [Three] would do with the facts that we have." RP at 792. The court denied the motion, "recognizing that it's a razor thin issue and it could go either way on appeal." RP at 806.

5

At sentencing, Mr. Tasker's lawyer asked the court to treat the attempted robbery and the kidnaping as the same criminal conduct for purposes of calculating an offender score. The court refused, noting that the robbery was completed before Mr. Tasker entered the vehicle.

Also at sentencing, Mr. Tasker was ordered to pay substantial restitution for Ms. Campos-White's medical expenses and the damage to her car; the undisputed total amount was $142,865.95. The court also imposed both mandatory and discretionary LFOs, asking Mr. Tasker about his prior work history and ability to pay. Despite the court's own observation that Mr. Tasker would likely never be able to repay the restitution, it imposed $600 in discretionary costs.

Mr. Tasker appeals.

## ANALYSIS

### I. Sufficiency of evidence: possession of a firearm

Mr. Tasker's base sentences on his three convictions run concurrently, with the longest being his 144 month sentence on the first degree kidnapping count. The firearm enhancement terms (60 months for the kidnapping and 36 months for the attempted robbery) run consecutive to his base sentence, increasing his sentence by eight years.

Mr. Tasker's argument that the State failed to meet a burden of proving he wielded an operable firearm during the crimes turns first and foremost on an issue of statutory construction: whether evidence of operability at the time of the crime is required because

the applicable statutory definition of "firearm" includes language that it is a weapon or device "from which a projectile or projectiles *may be fired.*" RCW 9.41.010(9) (emphasis added). He relies on our Supreme Court's 2008 decision in *Recuenco*, 163 Wn.2d 428, in which the court's reversal of a firearm enhancement did not turn on whether the firearm used was operable, but in which the court nonetheless stated, "We have held that a jury must be presented with sufficient evidence to find a firearm operable under [the statutory definition of "firearm"] in order to uphold the enhancement." 163 Wn.2d at 437 (citing *Pam*, 98 Wn.2d 748)). He also cites Division Two's 2010 decision in *Pierce*, which relied on *Recuenco* to reverse firearm enhancements it determined were unsupported by evidence that the handgun in Pierce's possession was "operable" and "capable of firing a projectile." 155 Wn. App. at 714-15. The *Pierce* court also partially rejected the State's argument that it need not produce and test a weapon in order to support a firearm enhancement, stating:

> This may be true when there is other evidence of operability, such as bullets found, gunshots heard, or muzzle flashes. Although the evidence is sufficient to prove an element of the offense of robbery or burglary or a deadly weapon enhancement, where proof of operability is not required, the evidence here is insufficient to support the imposition of a firearm sentencing enhancement, where proof of operability is required.

*Id.* at 714 n.11 (citing *Recuenco*, 163 Wn.2d at 437; *Pam*, 98 Wn.2d at 754-55).

In unpublished decisions, this division has rejected the contention that the State must present evidence specific to a firearm's operability in order to establish that a

defendant was armed for purposes of a firearm enhancement. We conclude that the statement in *Recuenco* does not support Mr. Tasker's position. We disagree with *Pierce*'s characterization of the State's burden in proving facts supporting a firearm enhancement. Our conclusions are based on a long line of Washington decisions and intervening statutory changes, to which we turn next.

*A. Statutory construction*

*Pre-"firearm enhancement" cases, 1980-1995*

The earliest relevant decision is *State v. Tongate*, 93 Wn.2d 751, 613 P.2d 121 (1980), in which our Supreme Court held that a jury making a finding in support of a deadly weapon sentence enhancement must be instructed on the State's burden to prove beyond a reasonable doubt that the defendant was armed in committing the crime. At the time *Tongate* was decided, and for the next 15 years, Washington law did not provide for a firearm enhancement, but only a deadly weapon enhancement. Former RCW 9.95.015 (1961). The words "deadly weapon" for purposes of the enhancement were defined by former RCW 9.95.040 (1976) to include, among other weapons, any "pistol, revolver, or any other firearm." "Firearm" was not defined.

The jury in *Tongate* was instructed accordingly, and was also instructed that "[t]he prosecution is not required to prove that a pistol, revolver or other type of firearm was loaded or even that it was capable of being fired." 93 Wn.2d at 753. On appeal, the defendant challenged the court's failure to instruct on the reasonable doubt standard; it

8

did not challenge the instruction that a firearm need not be loaded or capable of being fired. The Court of Appeals concluded that even if the reasonable doubt standard was omitted from the instruction in error, it was harmless, because the jury found the defendant guilty of first degree robbery and, implicitly, of being armed. The Supreme Court accepted review and reversed, reasoning that the robbery conviction required that the State prove only that the defendant displayed what *appeared* to be a gun, so that the jury could have found him guilty even if he "used a toy gun or other object that merely resembled a deadly weapon in the commission of a crime." *Id.* at 755. The court contrasted the deadly weapon enhancement statute, which it said "appears to require the presence of a deadly weapon *in fact.*" *Id.*

The State's burden in proving possession of a firearm was addressed again a few years later in *Pam*, 98 Wn.2d 748. As in *Tongate*, the trial court in *Pam* failed to instruct the jury that it must find facts supporting the enhancement beyond a reasonable doubt. Witnesses identified Pam as having participated in a robbery while armed, but testified that "[t]he weapon fell apart as Pam was running away," and police recovered only "the wooden forestock of 'what appeared to be a shotgun.'" *Id.* at 751. "The remainder of the weapon was not introduced into evidence." *Id.*

While the legislature still had not enacted a statutory definition of "firearm," the pattern jury instruction used at trial defined it as "a 'weapon from which a projectile may be fired by an explosive such as gun powder.'" *Id.* at 754 (citing 11 *Washington*

*Practice: Washington Pattern Jury Instructions: Criminal* 2:10 (1977) (WPIC)). The

1977 edition of the *Washington Pattern Jury Instructions* includes as a note that it "may

be used with any other instruction which includes the term firearm." WPIC 2.10 note on

use at 20. It describes the definition as having been adapted from *Webster's New*

*International Dictionary* 951 (2d ed.) and as having been approved in *State v. Edwards*,

17 Wn. App. 355, 359, 563 P.2d 212 (1977). WPIC 2.10 cmt. at 20. As discussed

hereafter, WPIC 2.10's definition of a "firearm," or virtually identical statutory

definitions, have been applied by Washington courts continuously in sentencing

enhancement cases since 1977, whether the enhancement at issue was a pre-1995 deadly

weapon enhancement or a post-1995 firearm enhancement.

The Supreme Court held in *Pam*, as it had in *Tongate*, that "the State must prove

the presence of a deadly weapon *in fact* in order to permit a special finding that the

defendant was armed with a deadly weapon" and his penalty "cannot be enhanced if the

evidence establishes only that he was armed with a gun-like, but nondeadly, object." *Id.*

at 753. It reversed, holding that "[w]ith appropriate instructions, a rational jury *could*

*have a reasonable doubt as to the operability* of the weapon." *Id.* at 755 (emphasis

added). While mentioning operability, the court did not hold that the State presented

insufficient evidence on that score. It implied instead that the fact that a defendant

employed a firearm to advance a crime and witnesses testify that it appeared real can be

sufficient evidence of ability to fire a projectile—but the fact that Pam's gun fell to pieces

called this ability (also referred to as "operability") into question. As a result, the failure

to instruct the jury on the reasonable doubt standard was reversible error.

In 1983, the legislature amended chapter 9.41 RCW, the Uniform Firearms Act,[2]

to criminalize the ownership or possession of a "short firearm or pistol" by a person

previously convicted of a crime of violence or a felony in which a firearm was used or

displayed. LAWS OF 1983, ch. 232, § 2. It also defined certain terms used in the statute,

including "firearm," adopting a statutory definition virtually identical to the definition

used in the pattern instruction in *Pam*. The only difference was that the statute referred to

a "weapon *or device*," rather than solely to a "weapon." *Id.* at § 1 (emphasis added),

*codified as* RCW 9.41.010.[3]

Also in 1983, and in anticipation of determinate sentencing, the legislature

---

[2] LAWS OF 1935, ch. 172, § 18. The Uniform Firearms Act was approved in 1930 by the National Conference of Commissioners on Uniform State Laws. It was described by the courts of Pennsylvania, the first state to adopt it, as crafted to "regulate and license the sale, transfer, and possession of certain firearms," including to "prevent[] the promiscuous carrying of deadly weapons concealed upon the person or in a vehicle." *Henry v. Pechin*, 27 Del. Co. 421, 31 Pa. D. & C. 484, 486 (1938). As chronicled in *Olsen v. Delmore*, 48 Wn.2d 545, 549-50, 295 P.2d 324, (1956), the Commissioners on Uniform State Laws replaced the Uniform Firearms Act with a uniform pistol act in 1940 and declared the uniform pistol act obsolete in 1949, removing it from the list of active uniform laws. Chapter 9.41 RCW has been extensively amended and presently includes very little of the original uniform act.

[3] In another minor modification, the definition of "firearm" in RCW 9.41.010 was amended in 1996 to add the plural "or *projectiles*" after "projectile." LAWS OF 1996, ch. 295, § 1 (emphasis added).

amended chapter 9.94A RCW, the Sentencing Reform Act of 1981 (SRA), to refer to enhanced deadly weapon sentencing in the sentencing grid and to add a deadly weapon special verdict provision. LAWS OF 1983, ch. 115, § 2 (sentencing grid), *codified as* former RCW 9.94A.310[4]; LAWS OF 1983, ch. 163, § 3 (deadly weapon special verdict), *codified as* former RCW 9.94A.125 (1983). Like the "deadly weapon" definition under the indeterminate sentencing provision in chapter 9.95 RCW, the new special verdict provision listed illustrative deadly weapons, including any "pistol, revolver, or any other firearm." "Firearm" remained undefined by the SRA.

In August 1983, Division One held that testimony by a witness that a defendant was armed with what appeared to be a real firearm satisfied the State's burden of "pro[ving] beyond a reasonable doubt the presence of a deadly weapon and firearm *in fact*," as required by *Tongate* and *Pam. State v. Mathe*, 35 Wn. App. 572, 581, 668 P.2d 599 (1983), *aff'd*, 102 Wn.2d 537, 688 P.2d 859 (1984). It held that the testimony of two witnesses who described in detail the guns used was sufficient circumstantial evidence that Mathe had used a "real and operable" gun. *Id.* at 582.

Witness testimony alone was again held sufficient to prove a defendant was armed with a firearm in committing a crime in *State v. Bowman*, 36 Wn. App. 798, 803, 678

---

[4] The deadly weapon sentence enhancement changes to the sentencing grid were later amended and recodified. *See* LAWS OF 1986, ch. 257, § 3 *recodified as* former RCW 9.94A.310(3) (1995); LAWS OF 2000, ch. 28, § 11; ch. 132, § 2, *recodified as* former RCW 9.94A.510 (2001).

P.2d 1273 (1984), *review denied*, 101 Wn.2d 1015 (1984). Noting that "[t]he State need not introduce the actual deadly weapon at trial," Division One held that the victim's detailed description of the gun and testimony that she had no doubt it was a gun sufficed. *Id.* (citing *Tongate*, 93 Wn.2d at 754). It noted that the defendant's threats to use the gun added additional credence to the jury's finding.

Our Supreme Court discussed the definition of "firearm" in RCW 9.41.010 in two decisions prior to 1995. In neither did it mention a requirement that the State offer evidence specific to a firearm's operability.

In *State v. Hentz*, 99 Wn.2d 538, 543, 663 P.2d 476 (1983), the court distinguished the State's burden of proving a threat to use a deadly weapon in committing first degree rape under RCW 9A.44.040(1) from deadly weapon enhancement provisions. It held first degree rape was proved by the State's evidence that Hentz threatened to shoot his victim if she did not cooperate, even though the handgun used later proved to be a realistic-looking plastic toy.[5] By contrast, the court observed, the penalty enhancement provision's language "requires the presence of a firearm or deadly weapon *in fact.*" *Hentz*, 99 Wn.2d at 543.

---

[5] The court observed that the relevant element of first degree rape under RCW 9A.44.040(1) at the time of the crime was that the perpetrator "[u]ses or threatens to use a deadly weapon." 99 Wn.2d at 541 (quoting former RCW 9A.44.040(1) (1982)). It held that the "threat" concept did not require an actual weapon. *Id.* The legislature thereafter amended former RCW 9A.44.040(1) to read "[u]ses or threatens to use a deadly weapon or what appears to be a deadly weapon." LAWS OF 1983, ch. 73, § 1.

*State v. Fowler*, 114 Wn.2d 59, 62, 785 P.2d 808 (1990) involved yet another trial court that failed to instruct the jury that the State's burden in proving that Fowler was armed with a deadly weapon was proof beyond a reasonable doubt. The Supreme Court considered whether such an error could be harmless. It concluded that since the jury had been instructed at least once on the State's heightened burden of proof in criminal cases, the erroneous omission of further instruction would be analyzed by looking at whether the error was harmless beyond a reasonable doubt.

Fowler was convicted of second degree assault occurring during a road rage incident, with a special finding that he was armed with a deadly weapon: a firearm. *Id.* The court described the State's burden in proving the presence of a deadly weapon with reference to *Pam:*

> According to RCW 9.95.040, the State must prove the presence of a deadly weapon *in fact* in order to permit a special finding that a defendant was armed with a deadly weapon. *State v. Pam*, 98 Wn.2d 748, 753, 659 P.2d 454 (1983), *overruled on other grounds in State v. Brown*, 111 Wn.2d 124, 143-44, 761 P.2d 588 (1988), *aff'd on rehearing*, 113 Wn.2d 520, 782 P.2d 1013 (1989). A defendant's penalty cannot be enhanced if the evidence establishes only that he was armed with a gunlike, but nondeadly, object. *Pam*, 98 Wn.2d at 753.

*Id.*

The evidence in support of the special finding in *Fowler* was the testimony of a motorist and his passenger that when the motorist stepped out of his car, Fowler pulled a gun out of a holster, pointing at the motorist and passenger as the motorist put his car into

14

reverse and began backing away. 114 Wn.2d at 61. Fowler denied pulling a gun or pointing a gun at anyone. The court held that based on the testimony of the couple as to what they saw and Fowler's admission that he owned a handgun, "it is clear the instruction error was harmless." *Id.* at 65.

To summarize, beginning in 1977, Washington decisions have relied on a dictionary definition of "firearm" that was approved in *Edwards*, was promptly adopted as a pattern instruction, and, in 1983, was relied on by the legislature as the statutory definition of the term in RCW 9.41.010, with only a minor modification. The definition was construed by Washington decisions prior to 1995 as requiring proof of a firearm *in fact*, as opposed to a gun-like but nondeadly weapon. Two decisions—*Pam* and *Mathe*—mentioned an "operable" gun. But both found that eyewitness testimony that described a gun as appearing real was sufficient to support a jury finding that an offender was armed with a firearm.

*Post-1995 legislation and case law*

In 1995 the Hard Time for Armed Crime Act (Hard Time Act), RCW 9.94A.510, created a new and more severe enhancement for crimes committed while armed with a firearm than had been provided by RCW 9.94A.125 for use of a deadly weapon. LAWS OF 1995, ch. 129, § 2 (Initiative 159); *State v. DeSantiago*, 149 Wn.2d 402, 415, 68 P.3d 1065 (2003). To effectuate the distinction, the legislature amended the sentencing grid provisions to provide for mutually exclusive firearm and deadly weapon enhancements,

15

incorporating the definition of "firearm" in RCW 9.41.010 to clarify the distinction. Subsection (3) of the sentencing grid provision addressed enhancements if the offender or an accomplice "was armed with a firearm *as defined in RCW 9.41.010*," while subsection (4) of the provision addressed enhancements if the offender or an accomplice "was armed with a deadly weapon as defined in this chapter *other than a firearm as defined in RCW 9.41.010*." LAWS OF 1995, ch. 129, § 2 (emphasis added).

Following the 1995 legislation explicitly incorporating the definition of "firearm" at RCW 9.41.010 as the basis for imposing the firearm enhancement, our court addressed "firearm" from the new vantage point of statutory construction, attempting to discern the intent of the legislature in using the longstanding case law definition.

Divisions One and Two of our court agreed that the statutory definition of "firearm" was ambiguous in indicating that a firearm must be capable of firing a projectile at some point in time, but failing to indicate whether the firearm must be operable when the crime is committed. Division Two reached this conclusion in *State v. Faust*, 93 Wn. App. 373, 376, 967 P.2d 1284 (1998). Division One reached the same conclusion in *State v. Padilla*, 95 Wn. App. 531, 534, 978 P.2d 1113 (1999).

In *Faust*, Division Two concluded that because the Hard Time Act incorporated the definition of "firearm" previously applied in *Tongate*, *Pam*, and Court of Appeals' decisions, then that case law was relevant in construing legislative intent and supported the conclusion that a firearm need not be operable at the time of the crime. *Faust*, 93

16

Wn. App. at 377-78.[6] It pointed to its own consistent holdings that an unloaded weapon

is a deadly weapon, *id.* at 380-81, and characterized *Tongate* and *Pam* as follows:

> [T]he *Tongate* language relied upon by *Pam* did not limit the definition of a
> firearm to one capable of being fired during the crime. Rather, the
> distinction was between a toy gun and a gun "in fact."
> . . . [W]hen the Legislature adopted the definition of firearm in 1983,
> the Washington Supreme Court had clearly set out the definition of firearm
> . . . [that] did not limit firearms to only those guns capable of being fired
> during the commission of the crime. Rather, the court characterized a
> firearm as a gun in fact, not a toy gun; and the real gun need not be loaded
> or even capable of being fired to be a firearm.

*Id.* at 380.

In *Padilla*, Division One looked not only at prior Washington decisions construing

the longstanding definition of "firearm," but also looked to the drafter's intent behind the

Hard Time Act, noting that "[i]n amending the firearms statutes in 1994, the Legislature's

intent was, among other things, to reduce violence." 95 Wn. App. at 534 (citing LAWS OF

1994, 1st Spec. Sess. ch. 7, § 101). Quoting from its earlier decision in *State v.*

*Anderson*, it concluded that

> "[i]t begs reason to assume that our Legislature intended to allow convicted
> felons to possess firearms so long as they are unloaded, or so long as they
> are temporarily in disrepair, or so long as they are temporarily
> disassembled, or so long as for any other reason they are not immediately

---

[6] It relied on the principle of statutory construction that courts "may resort to contemporaneous construction to determine legislative intent" and the principle that "because the Legislature is presumed to know of the decisions of the Washington Supreme Court, the court's prior use or interpretation of a term will be considered in ascertaining the meaning of a statute." *Faust*, 93 Wn. App. at 377-78.

operable." Such a result would allow convicted felons to escape an
unlawful possession charge simply by keeping a gun disassembled.

At the same time, "may be fired" indicates legislative intent that a
gun rendered *permanently* inoperable is not a firearm under the statutory
definition here at issue because it is not ever capable of being fired.
Therefore, we hold that a disassembled firearm that can be rendered
operational with reasonable effort and within a reasonable time period, is
a firearm within the meaning of RCW 9.41.010(1).

*Id.* at 535 (quoting *Anderson*, 94 Wn. App. 151, 162, 971 P.2d 585 (1999)), *rev'd on*

*other grounds*, 141 Wn.2d 357, 5 P.3d 1247 (2000)).

In *State v. McKee*, 141 Wn. App. 22, 30, 167 P.3d 575 (2007), *review denied*, 163

Wn.2d 1049 (2008), Division One held that there was sufficient evidence to support a

firearm enhancement where a rape victim testified that she was sure that a gun held to her

head during commission of the rape was real. *Id.* at 31. While she described the gun as a

"peripheral something to my head" and could not provide a specific description of it, she

testified that McKee "was holding it like a real gun" and that the "weight and feel of the

steel" against her head made her certain it was real. *Id.* The court rejected McKee's

challenge to the sufficiency of the evidence, explaining that "testimony regarding the

weight and feel of the gun, seeing a 'peripheral something to [her] head' and the way in

which McKee wielded it, combined with evidence that McKee had a real gun and had

access to guns [although none was found that met the victim's description], provided the

jury with sufficient evidence to support the firearm enhancement." *Id.*

Recuenco *and* Pierce

We now turn to *Recuenco*, which Mr. Tasker argues is controlling, and *Pierce*, which he argues properly applies *Recuenco*.

The trial court in *Recuenco* had instructed the jury to determine whether or not "'the defendant or an accomplice was armed with a deadly weapon at the time of commission of the crime.'" 163 Wn.2d at 438 (quoting former RCW 9.94A.125 (1983)). The jury answered yes, and because the evidence of a deadly weapon presented to the jury was evidence of a firearm, the court imposed the more severe firearm enhancement. It was the State's position that this was proper procedure, but it lost this argument in Recuenco's first appeal; our Supreme Court found *Blakely*[7] error because there was no jury finding that Recuenco had been armed with a "firearm." *State v. Recuenco*, 154 Wn.2d 156, 110 P.3d 188 (2005), *reversed on other grounds*, *Wash. v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006).

The issue on remand by the United States Supreme Court was whether *Blakely* error could be harmless under Washington law. A majority of the court concluded that it could not be. It was in illustrating a subsidiary point—the difference between a firearm enhancement and a deadly weapon enhancement—that the majority in *Recuenco* pointed out the two-year difference in the enhancements and stated that

---

[7] *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

19

[t]he dissent overlooks here that in order to prove a firearm enhancement, the State must introduce facts upon which the jury could find beyond a reasonable doubt the weapon in question falls under the definition of a "firearm": "a weapon or device from which a projectile may be fired by an explosive such as gunpowder." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 2.10.01 (2d ed. Supp. 2005) (WPIC). We have held that a jury must be presented with sufficient evidence to find a firearm operable under this definition in order to uphold the enhancement. *State v. Pam*, 98 Wn.2d 748, 754-55, 659 P.2d 454 (1983), *overruled in part on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988).

163 Wn.2d at 437.

A panel of Division Two has characterized *Recuenco*'s statement about the requirement of "sufficient evidence to find a firearm operable" as nonbinding dicta, pointing out that it was "merely to point out that differences exist between a deadly weapon sentencing enhancement and a firearm sentencing enhancement." *State v. Raleigh*, 157 Wn. App. 728, 735-36, 238 P.3d 1211 (2010). We agree. It was the fact that the two statutory enhancements are different, not how they are proved, that was germane to the majority's opinion.

But we also read the statement in *Recuenco* as consistent with earlier Washington decisions holding that evidence that an offender wielded a firearm that appeared real *is* evidence that it is operable, i.e., capable of firing a projectile. The facts that (1) a criminal uses a weapon to advance a crime and (2) it appears real are both circumstantial evidence of the type of operability required by the firearm definition. Where the weapon falls apart, as in *Pam*, a reasonable jury might conclude that it was not operable. But

20

where there is nothing to suggest it was defective, a reasonable jury can find that a real-looking gun used in a crime was operable and capable of being fired.

*Pierce* is more problematic. It involved a personal restraint petition, following an original appeal that preceded the decision in *Recuenco. See State v. Pierce*, noted at 135 Wn. App. 1014, 2006 WL 2924475. In his original appeal, Pierce had argued that the State presented insufficient evidence to support firearm enhancements. The panel assigned to the original appeal found the evidence sufficient.

In his personal restraint petition (PRP), Pierce argued that, as in *Recuenco*, the State charged and the jury found only that he had been armed with a deadly weapon, not a firearm, yet the court imposed firearm enhancements. 155 Wn. App. at 713. The panel assigned to the PRP agreed and, relying on the statement about proving operability in *Recuenco*, it also concluded that the enhancements were unsupported by evidence that the handgun he was alleged to have been carrying was "operable" and "capable of firing a projectile." *Id.* at 714-15. Responding to the State's argument that it was not required to have the weapon in order to support a firearm enhancement, the court said:

> This may be true when there is other evidence of operability, such as bullets found, gunshots heard, or muzzle flashes. Although the evidence is sufficient to prove an element of the offense of robbery or burglary or a deadly weapon enhancement, where proof of operability is not required, the evidence here is insufficient to support the imposition of a firearm sentencing enhancement, where proof of operability is required.

*Id.* at 714 n.11 (citing *Recuenco*, 163 Wn.2d at 437; *Pam*, 98 Wn.2d at 754-55).

21

While we agree that the evidence that Pierce was armed with a gun *in fact* was not strong,[8] we disagree with the suggestion in *Pierce* that the State must always present evidence specific to operability at the time of the crime. And five months after *Pierce*, another panel of Division Two reached a diametrically different result in *Raleigh*, in which, as noted earlier, it rejected *Recuenco*'s statement that a firearm must be proved

---

[8] In the original appeal, the court described the State's evidence, in part, as follows:

> Jerry Coble and his wife, Rosita, were awakened shortly before 5 a.m. on the morning of December 31, 2003, when an intruder shined a flashlight on them and ordered them to stay in bed and cover their heads. Jerry testified: "[T]he light was shining in first my eyes and in my wife's, back and forth, it shined on his own hand, and I saw what I interpreted to be a gun." Jerry said he was "under the impression that [he] was being robbed by an armed individual."
> The Cobles covered their heads as directed while the robber ransacked the bedroom. . . .
> On cross-examination, Jerry (age 73) acknowledged that neither he nor his wife were wearing their glasses. He said that it was too dark to identify the intruder in their bedroom and that the intruder had his face covered. Jerry also acknowledged that he was not absolutely positive that the intruder had a gun, saying, "[i]t could have been his finger and a piece of cardboard." However, Jerry believed that it was a gun and "wasn't willing to bet my life that it was a piece of cardboard."
> . . . [Rosita] also testified that the man in the bedroom was armed with a gun. On cross-examination, when asked how certain she was that the intruder had a gun, Rosita responded: "I'm not certain, but it looked like a gun, and I reacted as if it was a gun. It looked like a gun. He pointed it at me. He pointed it, the flashlight, to the gun. So I don't know anything about weapons, but to me it was a gun and it could kill us."

2006 WL 2924475, at *1 (first and second alterations in original) (footnote and citations omitted).

operational to support a sentencing enhancement as "non-binding dicta." 157 Wn. App.

at 735. Elaborating, it said:

> Raleigh argues that *Recuenco* overruled *Faust* sub silencio. It does not. As Faust notes, the case *Recuenco* relies on for the statement that a firearm must be operational, *State v. Pam*, does not hold that the firearm must be operational. Instead, *Pam* distinguished a true firearm and a gun-like object incapable of being fired. Furthermore, *State v. Tongate*, the case *Pam* relied on, focused on a toy gun versus a gun in fact. Here, there was no question that Raleigh's firearm was a gun in fact. Further, the issue in *Recuenco* was not whether a defendant had to possess an operational firearm. We adhere to *Faust*.

*Id.* at 735-36 (citations omitted).

For the foregoing reasons, we answer the trial court's request in this case for

guidance by joining in the reasoning of *Faust* and *Padilla*. In order to be a "firearm"

within the meaning of RCW 9.41.010, a device must be capable of being fired, either

instantly or with reasonable effort and within a reasonable time. Evidence that a device

appears to be a real gun and is being wielded in committing a crime is sufficient

circumstantial evidence that it is a firearm.

## B. *Evidence sufficiency in this case*

Turning to the sufficiency of the State's evidence in this case, "[t]he test for

determining the sufficiency of the evidence is whether, after viewing the evidence in the

light most favorable to the State, any rational trier of fact could have found guilt beyond a

reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The State presented sufficient evidence of what it was required to prove: that the gun Mr. Tasker used in the assault was a gun "in fact," rather than "a gunlike but nondeadly object." Fowler, 114 Wn.2d at 62 (emphasis omitted). Mr. Tasker pointed the gun at Ms. Campos-White's face in demanding her purse and used it to advance a kidnapping. Visibility was good; the crime occurred in daylight on a June afternoon. Ms. Campos-White saw the gun at close range and was unwavering in her testimony that it was a gun. While she forthrightly admitted to little experience with guns "in real life," she was old enough, as the mother of a middle schooler, to have seen guns in photographs, on the news, in television programs and in movies. The clicking noise she described hearing behind her head was consistent with Mr. Tasker's use of a real gun. Collectively, the evidence was sufficient to establish the gun met the definition of a "firearm" under RCW 9.41.010(9).

We affirm the convictions. For reasons discussed hereafter, we remand for the limited purpose of amending the judgment and sentence to strike the discretionary LFOs.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

24

*II. Same criminal conduct*

Mr. Tasker next contends the trial court erred when it did not count the kidnapping and attempted robbery as the same criminal conduct for purposes of calculating his offender score.

If two current offenses encompass the same criminal conduct, they count as one point when calculating a defendant's offender score. RCW 9.94A.589(1)(a). Two crimes are considered the same criminal conduct only if they involve the same time and place, the same victim, and the same criminal intent. *Id.* If one of these elements is missing, the offenses must be counted individually toward the offender score. *State v. Haddock*, 141 Wn.2d 103, 110, 3 P.3d 733 (2000).

A defendant bears the burden of proving that the crimes constitute the same criminal conduct. *State v. Aldana Graciano*, 176 Wn.2d 531, 538-39, 295 P.3d 219 (2013). A trial court's determination of whether two offenses constitute the same criminal conduct will not be reversed absent an abuse of discretion or a misapplication of law. *Id.* at 535-36.

The sentencing court concluded that the attempted robbery and kidnapping did not involve the same criminal intent, explaining that

> the defendant asked for the purse, he got the purse, he never asked for
> anything more, he wasn't in the car when he did it. There was no . . .
> evidence that there was any other effort to rob, uh, Ms. Campos-White,
> other than what happened when the Defendant was standing outside of the

vehicle. Once he got into the vehicle and told her to drive, that's when the kidnapping started.

RP at 821-22.

"[I]n construing the 'same criminal intent' prong, the standard is the extent to which the criminal intent, objectively viewed, changed from one crime to the next." *State v. Vike*, 125 Wn.2d 407, 411, 885 P.2d 824 (1994) (citing *State v. Dunaway*, 109 Wn.2d 207, 215, 743 P.2d 1237, 749 P.2d 160 (1987)).

> Intent, in this context, is not the particular *mens rea* element of the particular crime, but rather is the offender's objective criminal purpose in committing the crime. Thus, for example, the intent of robbery is to acquire property, and the intent of attempted murder is to kill someone.

*State v. Adame*, 56 Wn. App. 803, 811, 785 P.2d 1144 (1990).

Objectively viewed, Mr. Tasker's intent in committing the crime of attempted robbery was to acquire property. There was no evidence that Mr. Tasker's crime of kidnapping furthered this intent. He had already taken Ms. Campos-White's purse when he got in her car. While in the car, he never asked for more property, nor did he take her to a location where she could acquire more money or property for him. Mr. Tasker failed to demonstrate a continuing criminal intent to acquire property. The trial court did not abuse its discretion.

### III. LFOs

For the first time on appeal, Mr. Tasker challenges the trial court's finding that he has the present or likely future ability to pay discretionary LFOs.

26

As a preliminary matter, we consider whether to accept review of the issue where Mr. Tasker made no objection to the finding and thereby failed to preserve a claim of error. RAP 2.5(a); *State v. Blazina*, 182 Wn.2d 827, 833, 344 P.3d 680 (2015) ("[u]npreserved LFO errors do not command review as a matter of right"). "[A] defendant has the obligation to properly preserve a claim of error" and "appellate courts normally decline to review issues raised for the first time on appeal." *Id.* at 830, 834. The rationale for refusing to review an issue raised for the first time on appeal is well settled—issue preservation helps promote judicial economy by ensuring "that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals." *State v. Robinson*, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011).

Mr. Tasker has unquestionably waived his right to appeal the trial court's finding and imposition of discretionary LFOs, but we enjoy discretion to make an exception to the general requirement of issue preservation. In this case, since the sentencing court commented on the unlikelihood of Mr. Tasker's ability to pay, we exercise our discretion to review the issue.

RCW 10.01.160(3) provides in part that a court "shall not order a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant." In order to comply with the statute, an individualized inquiry must be made on the record. *Blazina*, 182 Wn.2d at 838. Among the important factors the court must

27

consider are "a defendant's other debts, including restitution." *Id.* A trial court's finding that a defendant has the "'resources and ability to pay is essentially factual and should be reviewed under the clearly erroneous standard.'" *State v. Bertrand*, 165 Wn. App. 393, 404 n.13, 267 P.3d 511 (2011) (quoting *State v. Baldwin*, 63 Wn. App. 303, 312, 818 P.2d 1116, 837 P.2d 646 (1991)).

Here, the court raised the issue of Mr. Tasker's ability to pay and observed that he would likely never be able to repay the $142,865 in restitution that he owes. Following *Blazina*'s directive that restitution and other debts be considered, it was clearly erroneous for the trial court to impose discretionary costs. The judgment and sentence is remanded for the limited purpose of striking discretionary LFOs imposed by the court.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Tasker raises five.

*Prosecutorial misconduct.* Mr. Tasker complains that during closing arguments the prosecutor improperly vouched for the credibility of Ms. Campos-White. The following portion of closing argument is at issue:

> [PROSECUTOR]: . . . And I submit to you Miss Campos-White's testimony is credible about what had happened to her, about who did it. Again, credibility, Miss Campos-White testified about the robbery and kidnapping. When she jumped out of the SUV, she did it because she believed if she didn't, something worse, something worse can happen to her and she won't her [sic], won't see her child again. Common sense, her behavior is consistent with someone who had a gun pointed at her.
> [DEFENSE]: Judge, I'm going to object to that. . . .
> . . . .

28

> . . . Because I think suggesting (inaudible). There's been no testimony to that.
> JUDGE: The jury is to recall my instruction that the remarks of counsel are not evidence and you are to base your decision on the evidence, uh, as you have heard it, uh, in this courtroom and on the Exhibits. And if you find that the comments are not supported by the evidence or by the instructions as I have given it, given them to you, you are dis, to disregard those comments. So the objection is overruled.

RP at 755-56.

Mr. Tasker also complains that during voir dire the prosecutor misstated the law and impermissibly shifted the State's burden of proof. The prosecutor asked potential jurors whether "it's fair the state only has to prove a case beyond a reasonable doubt and not beyond all doubt." RP at 211. Following an objection, the prosecutor rephrased the question and asked potential jurors which was a higher standard: "beyond a reasonable doubt" or "beyond all doubt." RP at 212.

A defendant claiming prosecutorial misconduct bears the burden of proving "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)).

"It is impermissible for a prosecutor to express a personal opinion as to the credibility of a witness or the guilt of a defendant." *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014) (citing *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984)). Such an opinion "violates the advocate-witness rule, which 'prohibits an

29

attorney from appearing as both a witness and an advocate in the same litigation.'" *Id.* (quoting *United States v. Prantil*, 764 F.2d 548, 552-53 (9th Cir. 1985)). But a prosecutor "has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010). Closing argument does not constitute improper vouching for witness credibility unless it is clear that the prosecutor is not arguing an inference from the evidence, but instead is expressing a personal opinion about credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008).

In the argument complained of by Mr. Tasker, the prosecutor was appropriately arguing inferences from Ms. Campos-White's testimony. He contended that based on the evidence, Ms. Campos-White's testimony was credible. There was no misconduct.

As to the prosecutor's asserted misstatement and shifting of the burden of proof, neither of the questions posed in voir dire can reasonably be understood to misrepresent the State's burden of proof. And at the conclusion of the trial, the court instructed the jury on the reasonable doubt standard. "Juries are presumed to follow the court's instructions absent evidence to the contrary." *State v. Dye*, 170 Wn. App. 340, 348, 283 P.3d 1130 (2012).

*Evidentiary issues.* Mr. Tasker argues that the trial court abused its discretion in admitting a surveillance video recovered from Selah Intermediate School that depicted a man "walking around the parking lot looking at different vehicles." RP at 553. Sergeant

30

Mark Lewis provided testimony in connection with the video, which Mr. Tasker argues was irrelevant, unduly prejudicial, lacked a proper foundation, and was improper evidence of prior bad acts.

Sergeant Lewis, an employee of the Moxee police force, testified briefly, telling jurors he was contacted by the Selah police and was asked to view a video in order to see if he recognized a person in it; he viewed the video and did recognize someone; he identified the individual to the Selah police. The sergeant did not offer an opinion as to what was going on in the video and abided by the court's in limine ruling that he not state that he recognized Mr. Tasker or explain how he knew him. The State contends it offered the sergeant's testimony to explain the "trail of investigation." RP at 567. Mr. Tasker fails to identify error or prejudice.

*Ineffective assistance of counsel.* Mr. Tasker argues he received ineffective assistance of counsel when his trial lawyer did not "properly argue false testimony," did not "object timely," and did not have the "proper to-convict instruction" ready to present to the court. SAG at 2. Because Mr. Tasker's challenge involves factual allegations outside the record of this appeal, his remedy is to seek relief by PRP. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

*Sufficiency of evidence: possession of a firearm.* Mr. Tasker argues that because no firearm was recovered, the State failed to prove he was ever in possession of a firearm. SAG at 6. As stated earlier, the test for determining the sufficiency of the evidence is

31

whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.

A person is guilty of unlawful possession of a firearm in the first degree if "the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted or found not guilty by reason of insanity in this state or elsewhere of any serious offense as defined in this chapter." RCW 9.41.040(1)(a). The same evidence that sufficed to support the firearm enhancements suffices to establish that Mr. Tasker had a firearm in his control.

*Sufficiency of evidence: attempted first degree robbery.* Finally, Mr. Tasker argues that insufficient evidence supports his conviction for attempted first degree robbery "due to lack of substantial evidence, lack of direct evidence and inconsistent testimony." SAG at 2. "A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person." RCW 9A.56.190. A person is guilty of first degree robbery, if in the commission of the crime, the person is armed with a deadly weapon. RCW 9A.56.200(a)(i). Evidence was presented to the jury that Mr. Tasker demanded Ms. Campos-White's purse while holding a gun to her face and took her purse when it was handed to him. As the trial court observed, "[i]n theory, maybe that could have been charged as a completed robbery." RP at 822. The State's evidence was sufficient.

32

No. 32826-1-III
*State v. Tasker*

We affirm the convictions and remand for the limited purpose of amending the judgment and sentence to strike the discretionary LFOs.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.