# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | No. 73552-7-I |
| Respondent, | |
| v. | DIVISION ONE |
| SIMON PUOT SOLOMON, | UNPUBLISHED OPINION |
| Appellant. | FILED: September 26, 2016 |

LEACH, J. — Simon Solomon appeals from his conviction for unlawful possession of a firearm in the first degree and the trial court's sentencing enhancement for use of a firearm during the commission of attempted robbery in the first degree. He contends that the trial court violated his constitutional rights by giving a jury instruction that shifted the burden to him to show reasonable doubt. He also challenges the sufficiency of the evidence to prove that he was in possession of or armed with a firearm when he committed the crime charged. The trial court's reasonable doubt instruction correctly stated the law. And we affirm Solomon's conviction and sentencing enhancement because the record contains sufficient evidence to support the jury's finding that he was armed with a firearm at the time of the incident.

## Background

In September of 2014, Brandon Smith placed an ad on Craigslist to sell marijuana. A potential buyer contacted him, and Smith planned to sell two ounces for $300 to an

individual who identified himself only as "Ja." The parties initially planned to meet near Smith's home in Tulalip, but that meeting fell through. They attempted to meet another time and finally, on their third attempt, they met in the Tulalip Walmart parking lot on September 30, 2014.

Smith left his home in Tulalip around 6:30 p.m. and went into the Walmart to buy groceries. Once he had finished, he called the buyer to find out where he was. The buyer told him that "they were on their way." Before that call, Smith had been under the impression that he would be meeting with only one person. He decided to move the car to a space with cars next to him on both sides "so that nobody could park next to [him] and jump in and out."

Appellant Simon Solomon and Jal Thareek approached Smith's car, yelling, "Is that you?" Thareek asked if he could "get in," and Smith gave permission; he had left the passenger side front door unlocked. Thareek got in the passenger side, pulled out a small revolver, and pointed it at Smith. Solomon knocked on the back driver's side window and demanded that Smith let him in. When Smith refused, Solomon ran around to the passenger side and got in the car as Thareek got out. Solomon also had a gun and hit Smith in the face with it, knocking off his glasses. Smith recalled Solomon telling him "he was going to blow my brains out."

Smith testified about the weapons as follows:

Q.    Okay. And do you have a conversation?
A.    No. He pretty much at that point had pulled out a little revolver.
Q.    Okay. And what do you mean by a revolver?
A.    A small, black, five-shot, like, Smith & Wesson revolver.
Q.    Okay. And about how long was the part that you could see?
A.    Not long at all. Maybe three, four inches.

-2-

Q. Okay. Did it look like a real gun to you?
A. Yeah.
Q. Okay. What makes you say that?
A. It was glossy.
Q. Okay. Have you seen Airsoft guns or other guns—
A. Yes.
Q. —BB guns?
A. Yeah, they have a metal silver tube down the middle. This was chrome lined.

. . . .

Q. . . . . And what kind of a gun was the—was the defendant holding?
A. It was a full-sized black—looked something like an HK, either a .40 or a .45 caliber.
Q. Okay. And did you—how close of a look did you get at that?
A. I was looking down the barrel.
Q. Okay. What could you see when you were looking down the barrel?
A. The rifling and the chrome lining.
Q. Okay. And when you say "the rifling," what do you mean by that?
A. Rif[ ]ling's what makes the projectile spin in the cylinder.
Q. Okay.
A. To make it shoot straight.
Q. Okay. And you own a firearm; correct?
A. Yes.
Q. Okay. And you're familiar with them?
A. Yes.
Q. Okay. In your opinion, was that an actual firearm that he was holding?
A. Yes.
Q. Okay. Did you know if it was loaded or not?
A. I don't know that one.

Smith then grabbed for his own weapon, a subcompact .40 caliber Smith & Wesson, but it caught in his shorts pocket. When Solomon asked Smith, "Where's the weed?," Smith pointed to the center console with his other hand. Smith turned on a flashlight and showed Solomon the marijuana in the center console. Smith then shined the light in Solomon's face, knocked his gun away, and then pointed his own gun at Solomon. Solomon yelled, "Don't shoot me," and exited the car.

Once Solomon had exited, Smith locked the doors. Solomon knocked on the window, demanding that Smith give him the marijuana. At one point, Solomon asked

Smith, "Do you want to get in a fire fight?" Smith began jumping up toward his open sunroof and screaming, "Help! Police. Police. Help." During this time, Thareek was still trying to get into Smith's car and broke the rear passenger door handle.

Smith looked over his left shoulder, heard his window shatter, and saw glass go everywhere. He then heard a loud boom that led him to think that he "had either been shot or [Thareek had] shot through in the car." Smith was looking toward the back window while he still had his gun pointed at Solomon and pulled the trigger. He turned around and saw Solomon running away. Smith then turned back to Thareek, opened the door, pointed the gun at him and yelled, "Get the F out of here."

Smith looked around the car for his glasses but was unable to find them. He found his keys and drove out of the parking lot. Smith stopped on his way home to look again for his glasses and his cell phone. He saw police officers drive past him but continued driving home. He later discovered that the marijuana was missing from the car.

Smith told his family what had happened. He then went to the state patrol office to report the incident. Initially, he did not tell the police that he had planned to sell marijuana or that anything had been taken from him.

In the meantime, the police searched the area but found no bullets, shell casings, or guns. Nor did they find bullet holes in any nearby objects. A search of Smith's car revealed a broken passenger front window, a small amount of marijuana, and no bullets, bullet holes, bullet strikes, or shell casings. Police took Smith to Providence Hospital in Everett, where Solomon was being treated for a gunshot wound to his arm. Smith

identified Thareek as one of the men involved in the incident but did not see or identify Solomon.

J.R. and her mother were also in the Walmart parking lot at that time and heard two men yelling. J.R. saw one of them pull a gun out of his pants. She told her mother, Jeanna Reeves, "Mom, that guy has a—has a gun." Her mother asked her how she knew that, and J.R told her, "I seen it." Reeves remembered her daughter telling her that it looked "like a 9 millimeter" that the man pulled out of his pocket.

Reeves then told J.R. to hurry into the store. As J.R. ran toward the store's main entrance, she heard two gunshots, with "about a second or two spacing in between," and glass shattering after the first gunshot. She tried to guess at the size of the gun compared to her Airsoft gun at home, but she admitted that it was hard to see because it was dark outside and she was far away. Reeves said that she heard three gunshots, a window shatter after the second shot, and then the third shot immediately following.

David Sallee, an off duty police officer, was walking with his wife, Dawn, toward Walmart when he noticed men running around a car. The two heard one loud pop and believed the sound came from fireworks. Neither heard any glass shatter nor saw a gun. Eleanor Wilson also heard what she thought were fireworks in the Walmart parking lot. She saw a heavy set African American exit a car and a voice say, "Shit. Shit. Run. Run." Gary Stewart, who was working at Walmart at the time, heard "maybe a little scuffling," followed by two or three gunshots and glass breaking. He saw two African American men in the parking lot. Stewart noticed that one appeared to put something in his belt, but he could not tell what the object was.

Detective Bilyeu reviewed the surveillance video from the Walmart parking lot. From his review, he was unable to discern if either of the two men outside the car had a gun or what was happening inside the car. Bilyeu concluded that at least one shot had been fired based on Smith's statement and seeing the two men suddenly run from the car.

The State charged Solomon with first degree robbery while armed with a firearm while on community custody and unlawful possession of a firearm in the first degree. A jury found him guilty of one count of attempted first degree robbery and unlawful possession of a firearm in the first degree. Solomon appeals.

Analysis

Reasonable Doubt Jury Instruction

Solomon challenges the trial court's use of the standard jury instruction defining "reasonable doubt." The instruction reads, in part:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. [If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.][1]

Solomon argues that this instruction is constitutionally defective because it tells jurors they must be able to articulate a reason for having a reasonable doubt. According to him, the instruction resembles improper "fill-in-the-blank" arguments that impermissibly shift the burden of proof and may constitute prosecutorial misconduct.

---

[1] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed. 2008) (WPIC).

In State v. Bennett,[2] our Supreme Court directed trial courts to use WPIC 4.01 in all criminal cases. More recently, in State v. Kalebaugh,[3] the Supreme Court reaffirmed that WPIC 4.01 was the "proper" instruction and "the correct legal instruction on reasonable doubt." This court recently noted the Supreme Court's directive and upheld the use of WPIC 4.01 in State v. Lizarraga.[4] Because controlling case authority directs the use of this standard instruction, we reject Solomon's claim.[5]

## Sufficient Evidence of a Firearm

Solomon also contends the State presented insufficient evidence to support his conviction for unlawful possession of a firearm and imposition of the firearm enhancement.

In reviewing a challenge to the sufficiency of the evidence, we determine whether any rational trier of fact could find the elements of the crime beyond a reasonable doubt.[6] A crime's elements may be established by direct or circumstantial evidence with neither having greater value than the other.[7] A challenge to the sufficiency of the evidence admits

---

[2] 161 Wn.2d 303, 318, 165 P.3d 1241 (2007).

[3] 183 Wn.2d 578, 585-86, 355 P.3d 253 (2015).

[4] 191 Wn. App. 530, 567, 364 P.3d 810 (2015), review denied, 185 Wn.2d 1022 (2016).

[5] Solomon argues that Bennett and Kalebaugh do not control because the appellants in none of the cases challenged the language requiring "a reason" in the jury instruction. This language, however, was expressly challenged on appeal in Lizarraga, where this court upheld that the jury instruction on reasonable doubt was a correct statement of the law.

[6] State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

[7] State v. Myers, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997).

the truth of the State's evidence.[8] We view all facts and draw reasonable inferences in the light most favorable to the State.[9]

Here, the State was required to prove that Solomon knowingly had a firearm in his possession or control on September 30, 2014, and that he was armed with a firearm at the time he committed the crime charged. RCW 9.41.010(9) defines a firearm as "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." This definition was used in the jury instructions for both the firearm enhancement and the charge of unlawful possession of a firearm.

Solomon contends that this burden required the State to prove that the firearm was "operable," and it failed to do so. He relies on the reasoning and holding in State v. Pierce[10] to support his argument. In Pierce, Division Two held that the State was required to present sufficient evidence that a firearm used in the commission of a crime was operable.[11] But the same court later dismissed the operability requirement for the statutory definition of "firearm," reaffirming that "the relevant question" is whether the firearm is a 'gun in fact' rather than a 'toy gun.'"[12] Earlier this year, Division Three examined the history and evolution of the operability requirement, ultimately holding that the State is not required to present "evidence specific to a firearm's operability in order to establish that a defendant was armed for purposes of a firearms enhancement."[13]

---

[8] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

[9] Salinas, 119 Wn.2d at 201.

[10] 155 Wn. App. 701, 230 P.3d 237 (2010).

[11] Pierce, 155 Wn. App. at 714-15.

[12] State v. Raleigh, 157 Wn. App. 728, 734, 238 P.3d 1211 (2010) (quoting State v. Faust, 93 Wn. App. 373, 380, 967 P.2d 1284 (1998)).

[13] State v. Tasker, 193 Wn. App. 575, 581, 373 P.3d 310 (2016), petition for review filed, No. 93237-9 (Wash. June 13, 2016).

We need not resolve the parties' disagreement regarding the State's burden. Even if the statute requires proof of operability, we have previously held that operability may be inferred from the threat to use a real gun. In State v. Mathe,[14] we held that the State proved the defendant "used a real and operable gun" with testimony of two robbery eyewitnesses who described the guns and the defendant's express or implied threat to use them. Similarly, in State v. Bowman,[15] eyewitness testimony describing a "real" gun and recounting a threat to use it was sufficient to establish "the existence of a real, operable gun *in fact.*"

Here, Smith, the owner of "a subcompact .40 caliber Smith & Wesson," testified that he was familiar with firearms and that he felt that the guns Thaleek and Solomon used were real. He described Thaleek's weapon as "[a] small, black, five-shot, like, Smith & Wesson revolver" that was "[m]aybe three, four inches" long. He distinguished it from an Airsoft or a BB gun because those have "a metal silver tube down the middle," while Thaleek's weapon was "glossy" and "chrome lined."

Smith testified that Solomon was holding "a full-sized black . . . something like an HK, either a .40 or a .45 caliber." When Smith looked down the barrel, he could not tell if the gun was loaded. But he could see the gun's rifling and chrome lining. He explained to counsel that the rifling made the projectile spin in the cylinder in order to shoot straight. When Solomon hit him with the gun, he estimated its weight to be at least two pounds. After Smith pulled out his gun, Solomon jumped out of the car and resumed threatening

---

[14] 35 Wn. App. 572, 581-82, 668 P.2d 599 (1983), aff'd, 102 Wn.2d 537, 688 P.2d 859 (1984).

[15] 36 Wn. App. 798, 803, 678 P.2d 1273 (1984).

Smith, asking if he "want[ed] to get in a fire fight." In addition to Smith's testimony, several witnesses testified to hearing two or more gunshots or seeing what appeared to them to be a real gun. Interpreting these facts in the light most favorable to the State, sufficient evidence exists for a rational trier of fact to conclude that Solomon was armed with a firearm.

Solomon argues that the State failed to prove that he was armed with a firearm because the State presented no evidence of operability, such as bullets, bullet holes, or shell casings. Because we view the evidence in the light most favorable to the State when resolving a challenge to the sufficiency of the evidence, the mere existence of inconsistent or differing evidence does not negate the sufficiency of the evidence presented.[16] Solomon's arguments go to the credibility of the evidence, not its sufficiency. An appellate court must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence.[17]

Finally, Solomon asks that this court exercise its discretion to deny any appellate costs the State may request as the prevailing party. The trial court found him indigent and appointed appellate counsel at public expense. "The commissioner or clerk 'will' award costs to the State if the State is the substantially prevailing party on review, '*unless the appellate court directs otherwise in its decision terminating review*.'"[18] In State v. Sinclair,[19] this court used its discretion to deny appellate costs to the State when the

---

[16] See Salinas, 119 Wn.2d at 201.
[17] State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).
[18] State v. Sinclair, 192 Wn. App. 380, 385-86, 367 P.3d 612 (quoting RAP 14.2), review denied, 185 Wn.2d 1034 (2016).
[19] 192 Wn. App. 380, 393, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016).

defendant remained indigent and this court saw "no realistic possibility," given that the defendant was 66 years old and received a 280-month prison sentence, that he would be able to pay appellate costs.

This court has discretion to consider the issue of appellate costs when a party raises the issue in its brief.[20] Here, nothing in the record before us shows that Solomon's financial condition has improved since the trial court found him indigent. The State has offered nothing beyond speculation that it may improve in the future. Based on this record, we deny appellate costs to the State.

We affirm Solomon's conviction and sentencing enhancement.

_Leach, J._

WE CONCUR:

_Cox, J._

_Becker, J._

---

[20] Sinclair, 192 Wn. App. at 388-90.