129 P.3d 856 (2006)
131 Wash.App. 855
STATE of Washington, Respondent.
v.
Jason Stewart FERGUSON, Appellant.
No. 32683-3-II.
Court of Appeals of Washington, Division 2.
March 7, 2006.
*857 Suzan L. Clark, Attorney at Law, Vancouver, WA, for Appellant.
Michael C. Kinnie, Attorney at Law, Vancouver, WA, for Respondent.

OPINION PUBLISHED IN PART
PENOYAR, J.
¶ 1 Jason Stewart Ferguson appeals his second degree murder and first degree assault convictions. He stabbed two men during a fight outside a Vancouver nightclub and claimed at trial that he acted in selfdefense. On appeal, he argues that the trial court erred in refusing to give his proposed selfdefense instruction. Finding no error, we affirm.

FACTS
¶ 2 On the evening of February 28, 2004, Ferguson was at the Bliss nightclub in Vancouver with his girlfriend, Angela Meehan, and his good friend, Jeremy Seley. The murder victim, Lavell Lindsey, was also at the club that night with his friends L.G. Harvey, Gabriel Hill, Daniel Hahn, and Gregory Dalton. While at the club, Harvey spoke briefly with Seley, whom he recognized because they had attended the same middle school. The mood at the club that evening was generally good.
¶ 3 As the nightclub closed in the early morning of February 29, the patrons started toward their vehicles. Ferguson got into the driver's seat of his Ford Explorer SUV, with Meehan in the passenger seat, Seley in the back seat behind Ferguson, and another passenger behind Meehan.
¶ 4 As Ferguson drove through the parking lot, Seley asked him to stop. Seley then called Harvey over to confront him about jumping Seley in junior high. Seley remained in the SUV's back seat and exchanged angry words with Harvey and Hill, who were standing outside the SUV. As the argument became more heated, the others in the SUV told Seley to be quiet. Meehan got out of the passenger side to try to intervene.
¶ 5 As Meehan got out, Lindsey approached the SUV from the front. Ferguson told Lindsey, "Move, bitch, get out the way [sic]." 4A Report of Proceeding (RP) (10/27/04) at 338. Lindsey responded, "Man, you don't know me, but if you want some, I'm right here." 4A RP (10/27/04) at 338. Lindsey then took off his shirt. Ferguson took his knife from the console and got out of the SUV. Lindsey started punching Ferguson, and Ferguson responded with the knife.
¶ 6 As Lindsey and Ferguson fought, Seley saw more people approaching and jumped out of the SUV to support Ferguson. Harvey tackled Seley and both fell into the bushes.
¶ 7 Thinking Lindsey needed help, Dalton came up to attack Ferguson from behind. Hill saw Ferguson had something shiny in his hand and called to Dalton, "Look out, he's got brass knuckles." 4B RP (10/27/04) at 399-400. On hearing this, Ferguson turned around and cut Dalton in the neck with the knife as Dalton was swinging at him. Dalton fell into the bushes next to Harvey and Seley.
¶ 8 At this point, Lindsey fell backwards, having sustained multiple stab wounds. Ferguson and Meehan jumped back into the SUV and Ferguson drove away quickly, leaving Seley. Meehan threw the bloody knife out of the window as the SUV left the Bliss's parking lot. Ferguson circled around looking for Seley but he had run away. Ferguson then drove to an AM/PM gas station nearby, where he and Meehan washed the blood off themselves. Two bouncers from the Bliss followed the SUV to the AM/PM, *858 noted the SUV's license plate number, and returned to the night club to report it to police.
¶ 9 Lindsey's friends did not see that Ferguson had a knife. After the SUV drove away, Hill noticed Lindsey's shirt and one dress shoe on the ground. Hill picked them up and put them into Hahn's car, the car in which Lindsey had been riding. Hill did not realize that Lindsey was badly injured. Lindsey's friends called 911 when they saw him on the ground bleeding extensively.
¶ 10 Lindsey died from the multiple stab wounds. At trial, the medical examiner testified that Lindsey received twelve separate knife wounds, including two in the head and six in the back. One stab penetrated Lindsey's skull, and another severed an artery. Doctors treated the knife wound to Dalton's neck, which would have been life threatening if not treated.
¶ 11 Meehan wrapped the knife's sheath in her blouse and left it on the SUV's floor. Police later arrested her at her house and she told them where she had thrown the knife out the window. Police recovered the knife at the scene, a 4.5 inch fixed blade knife with blood on it. The blood on the knife was never tested. The medical examiner testified that the knife recovered was consistent with Lindsey's wounds.
¶ 12 Around 3 A.M., police pulled Ferguson over, took him from his vehicle at gunpoint, and handcuffed him as part of a "felony stop." 2 RP (10/25/04) at 70-71. Noticing that he had a wound on his left leg, police transported Ferguson to the hospital in a patrol car. Ferguson remained in handcuffs during his transport and while doctors treated him at the hospital. Police seized Ferguson's clothes at the hospital for evidence.
¶ 13 After treatment, police transported Ferguson directly to the Major Crimes Unit, located in a secure building. Police removed the handcuffs and told Ferguson he was free to leave. Ferguson was still wearing the hospital gown At this point. Without advising Ferguson of his Miranda[1] rights, police interviewed him for approximately one hour. Once Ferguson admitted that the knife police found at the scene belonged to him, he was arrested. After placing him under arrest, police read Ferguson his Miranda rights and proceeded to interview him on tape.
¶ 14 Ferguson was charged with second degree murder in Lindsey's death and first degree assault of Dalton. The second degree murder instructions allowed conviction if the jury found the elements of intentional second degree murder or if the jury found second degree felony murder with second degree assault as the predicate felony. The jury convicted Ferguson of both first degree assault of Dalton and second degree murder of Lindsey. The second degree murder verdict was a general verdict that did not specify whether it was based on intentional second degree murder or on felony murder.

ANALYSIS

I. Jury instructions on self-defense
¶ 15 At trial, Ferguson proposed Washington Pattern Jury Instruction Number (WPIC) 17.02, defining the force one may use in self-defense in an assault case. The proposed instruction said in relevant part:
It is a defense to a charge of assault I and assault II that the force used was lawful as defined in this instruction.
The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured ... in preventing or attempting to prevent an offense against the person and when the force is not more than is necessary.
Clerk's Paper (CP) 86. Ferguson proposed this instruction for both his charge of first degree assault and his charge of Second degree murder. The court used this instruction only for the assault charge.
¶ 16 For the murder charge, the court instead used the State's proposed instruction, based on WPIC 16.02. That reads in relevant part:
It is a defense to a charge of murder in the second degree that the homicide was justifiable as defined in this instruction.

*859 Homicide is justifiable when committed in the lawful defense of the slayer or any person in the slayer's presence or company when:
(1) The slayer reasonably believed that the person slain, or those who the slayer reasonably believed were acting in concert with the person slain, intended to ... inflict death or great personal injury;

CP 130, Instr. 19.
¶ 17 Ferguson assigns error, claiming he could lawfully use the knife if he believed only that he was about to be injured and that requiring him to believe that Lindsey was about to inflict death or great personal injury sets his standard of proof too high. Because the jurors were analyzing the charge of second degree assault as the predicate felony for his felony murder charge, Ferguson argues they should have been instructed on self-defense as it applies to second degree assault. Ferguson cites to State v. Goodrich, 72 Wash.App. 71, 77, 863 P.2d 599 (1993), an example of a second degree felony murder case in which the underlying crime was second degree assault and the court used WPIC 17.02.
¶ 18 We review de novo the trial court's refusal to give an instruction when the refusal is based on a ruling of law. State v. Walker, 136 Wash.2d 767, 772, 966 P.2d 883 (1998). In this case, the trial court agreed with the State that because Ferguson used deadly force, "you use the standard of self-defense dealing with how much damage you're allowed to do." 6 RP (Oct. 29, 2004) at 746.
¶ 19 To justify killing in self-defense, the slayer must believe that he or someone else is about to suffer death or great personal injury (some cases call it great bodily injury or great bodily harm).[2] RCW 9A.16.050(1); State v. Walden, 131 Wash.2d 469, 474, 932 P.2d 1237 (1997); State v. Churchill, 52 Wash. 210, 223, 100 P. 309 (1909). Simple assault or an ordinary battery cannot justify taking a human life. Walker, 136 Wash.2d at 774, 966 P.2d 883.
¶ 20 The Churchill case addressed the issue directly because the defendant in that case, like Ferguson, claimed the jury instruction erroneously required "great bodily harm" instead of simply "bodily harm." Churchill, 52 Wash. at 218-19, 100 P. 309. The court found no error in using the words "great bodily harm," saying that the defendant's proposal would "give encouragement to the taking of human life upon the merest pretext of danger." Churchill, 52 Wash. at 223, 100 P. 309.
¶ 21 More recently, the Washington Supreme Court referred to Churchill while approving a jury instruction that said:
One has the right to use force only to the extent of what appears to be the apparent imminent danger at the time. However, when there is no reasonable ground for the person attacked ... to believe that his person is in imminent danger of death or great bodily harm, and it appears to him that only an ordinary battery is all that is intended, he has no right to repel a threatened assault by the use of a deadly weapon in a deadly manner.
Walden, 131 Wash.2d at 475, 932 P.2d 1237. In that case, the defendant used a deadly weapon to fend off an attack by three unarmed teenagers. Walden, 131 Wash.2d at 471-72, 932 P.2d 1237. The Walden court determined that the use of deadly force may have been reasonable despite the victims being unarmed if the defendant reasonably believed that death or great bodily harm was imminent. Walden, 131 Wash.2d at 477-78, 932 P.2d 1237; see also Walker, 136 Wash.2d at 774-75, 966 P.2d 883.
¶ 22 In this case, the trial court did not err in giving WPIC 16.02 instead of WPIC 17.02. Ferguson's actions led to another's death and the jury was properly instructed about the circumstances under which deadly force is lawful. We hold that WPIC 17.02 can never be given in a felony *860 murder case where assault is the predicate felony because it can never be reasonable to use a deadly weapon in a deadly manner unless the person attacked had reasonable grounds to fear death or great bodily harm. See Walden, 131 Wash.2d at 475, 932 P.2d 1237.
¶ 23 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
¶ 24 Affirmed.
BRIDGEWATER, J., and QUINNBRINTNALL, C.J., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Goodrich, 72 Wash.App. at 74, 863 P.2d 599, is an exception. In that case, the parties and the trial court apparently agreed to use WPIC 17.02 for a felony murder charge where assault was the predicate felony. However, the issue of whether WPIC 17.02 was appropriate in that context was not placed before the court of appeals in Goodrich. Because the issue is before us now, we expressly disapprove of its use at trial where the defendant is facing felony murder charges.