186 P.3d 1084 (2008)
143 Wash.App. 936
STATE of Washington, Respondent,
v.
Ossie Lee SLAUGHTER, Appellant.
No. 59256-4-I.
Court of Appeals of Washington, Division 1.
April 14, 2008.
*1085 Andrew Peter Zinner, Nielsen, Broman & Koch, PLLC, Seattle, WA, for Appellant.
Andrea Ruth Vitalich, King County Prosecutor's Office, Seattle, WA, for Respondent.

PUBLISHED IN PART
AGID, J.
¶ 1 Ossie Slaughter appeals his convictions for second degree felony murder and misdemeanor violation of a no-contact order. He argues that the trial court's jury instruction on the use of lawful force erroneously omitted the State's burden to disprove self-defense, and that his motion for a mistrial should have been granted when the State elicited testimony suggesting he may have spent time in jail. But the instruction Slaughter complains about was not a self-defense instruction to the felony murder charge. Rather, it correctly explained the meaning of "use of lawful force" referenced in the excusable homicide instruction. And the prejudicial effect, if any, of the reference to time Slaughter may have spent in jail did not justify a mistrial. We therefore affirm.

FACTS
¶ 2 The State charged Slaughter with the murder of Vernando Rosborough, second degree assault of Mecca Weatherby, and a violation of a no-contact order that Weatherby had against him. The charges arose out of a series of events occurring on October 30 and 31, 2003. On the evening of October 30, Slaughter went to Weatherby's apartment in Des Moines. Weatherby had a no-contact order against Slaughter at the time. According to Weatherby, Slaughter called her and told her he wanted to find her. She then called her mother, Royce House, who lived in the same apartment complex and told her to come over. But before House arrived, Slaughter came to Weatherby's apartment.
¶ 3 According to Weatherby, Slaughter pushed his way into the apartment, threatened to kill her, and held a large knife to her throat. According to House, Slaughter was waiving around a large knife and banging his head against the wall when she arrived. He said he wanted to take Weatherby and her young daughter in House's car to go somewhere. House then offered to drive Slaughter to where he wanted to go, and he agreed. According to Weatherby, before he left with House, Slaughter took a knife from the kitchen. House did not see any knives on Slaughter when he got into her car.
¶ 4 Over the next six hours, House drove Slaughter to several places from South Seattle to Auburn, and during one of those stops, House believed he bought drugs. Their final stop was at an apartment complex in Seatac where Patrick Spitzer, an acquaintance of Slaughter lived. When House and Slaughter entered the apartment, two men, John Evans and Vernando Rosborough, were in the living room watching a movie. Slaughter asked Evans and Rosborough if they wanted to smoke crack with him, and Rosborough agreed. Slaughter and Rosborough then went to the bedroom while Evans and House stayed in the living room and watched the movie. House later left the apartment to go to her car.[1]
¶ 5 While she was gone, Evans heard "socking" sounds coming from the bedroom and walked toward the bedroom to find out what was happening. According to Evans, Slaughter and Rosborough were trying to punch each other, he pulled Slaughter off Rosborough and out of the room, and Slaughter left with House. After Slaughter left, Rosborough collapsed and Evans called 911. King County Sheriff's deputies and medics arrived, but Rosborough could not be resuscitated. Rosborough died from a single stab wound to the chest, but he had no injuries consistent with a fistfight. Police did not recover the murder weapon.
*1086 ¶ 6 According to House, she got lost trying to find her car, and on her way back to Spitzer's apartment, she heard a "thud," as if someone had been hit or hurt, then fell. She then ran back to her car, and Slaughter came out to her car. Slaughter was holding a knife with blood dripping from it, and his clothes were bloodied. Slaughter then told House to leave quickly, that "it had to be done," and that "it was self defense." While she drove away with Slaughter, she told him to throw the evidence out the window. He threw out the knife and possibly some clothing.
¶ 7 Meanwhile, Weatherby had called 911, claiming that Slaughter kidnapped her mother, assaulted her with knife, and violated a protective order. According to Weatherby, she called 911 after she called Slaughter's cell phone and he told her she would not be seeing her mom anymore. A police officer then came to Weatherby's apartment and arrested Slaughter when he and House arrived back at Weatherby's apartment complex. Slaughter gave a statement to the police in which he admitted having contact with Weatherby, but denied assaulting her. He also admitted to driving around with House, but did not mention being at Spitzer's apartment.
¶ 8 Suspecting that Slaughter had been involved in the stabbing, the Des Moines police contacted the King County Sheriff's Office and detectives came to interview Slaughter. Slaughter agreed to give a taped statement. He told police that he and Rosborough were "tussling" over a crack pipe, and at some point, Rosborough came at him with a knife. Slaughter claimed Rosborough was stabbed somehow during the struggle and that he was not even aware that Rosborough had been stabbed at the time. But he did admit telling House that he thought he might have "stuck" him while they were fighting. He also admitted that he threw the knife out the window of House's car. He explained the bloodstains on his pants as the result of a cut on his thumb, but deoxyribonucleic acid (DNA) testing later revealed that the stains matched Rosborough's DNA profile.
¶ 9 The State proceeded to trial on charges of second degree intentional murder or, in the alternative, second degree felony murder, second degree assault against Weatherby, and violation of a no-contact order. Slaughter did not testify, but he argued that the stabbing was an accident caused while he was defending himself against Rosborough. At Slaughter's request, the trial court instructed the jury on the defense of excusable homicide. The jury acquitted him on the second degree assault charge involving Weatherby but found him guilty of second degree felony murder and violation of a no-contact order. The trial court gave him a standard range sentence of 278 months.
I. Jury Instructions
¶ 10 Slaughter first challenges the trial court's instruction on the use of lawful force, arguing that it erroneously omitted the State's burden of proving the absence of self-defense. We review challenges to jury instructions de novo, within the context of the jury instructions as a whole.[2] "Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law."[3] Instructional errors that tend to shift the burden of proof to a criminal defendant are of constitutional magnitude because they may implicate a defendant's due process rights.[4] Thus, despite his failure to raise it below, Slaughter's argument that the trial court's jury instruction relieved the State of its burden of disproving self-defense in a murder prosecution raises a constitutional issue that may be heard for the first time on appeal.[5]
¶ 11 In a case where a defendant does something in self-defense that leads to an accidental homicide, the applicable defense *1087 is excusable, not justifiable, homicide.[6] Excusable homicide is available only when the defendant is "doing any lawful act by lawful means."[7] The use of force is lawful when the defendant is about to be injured, so long as the force used is not more than necessary.[8] Thus, a defendant could argue that his action precipitating an accidental killing amounted to lawful self-defense, even if he could not argue that an accidental killing was a justifiable homicide.[9]
¶ 12 Here, the defense Slaughter asserted was "accidental homicide in the course of self-defense to an assault." Accordingly, at his request, the trial court gave WPIC 15.01 on excusable homicide which instructed the jury that "[h]omicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, without criminal negligence, or without any unlawful intent." The instruction further stated that the State had the burden of proving the absence of this defense.
¶ 13 The court also gave the following instruction on lawful force, as defined in WPIC 17.02 and RCW 9A.16.020(3):
The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person and when the force is not more than is necessary.
The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of the incident.
In doing so, the trial court explained that this instruction was included to help the defense explain "the excusable homicide defense at issue here" and that it was modified from WPIC 17.02 "because it is not being given as a defense to a particular charge," but rather to explain the phrase in the excusable homicide instruction "doing any lawful act by any lawful means."[10]
¶ 14 Slaughter asserts that the modified WPIC 17.02 instruction was a self-defense instruction that the trial court gave to address his self-defense theory on the underlying assault. He contends that this instruction erroneously omitted the State's burden to disprove the defense. But as the trial court explicitly stated, this instruction was not being given to provide a separate defense, such as a self-defense claim on the homicide or assault charge, as Slaughter suggests. Rather, as the court explained, this instruction defined "lawful act" as used in the excusable homicide instruction and allowed Slaughter to argue his theory of self-defense to explain that he was acting lawfully when the accidental homicide was committed. The court therefore properly excluded language on the State's burden of proof to prevent any implication that this was a separate defense. The defense of excusable homicide and the State's corresponding burden of proof were correctly stated in the excusable homicide instruction. It was that instruction which set forth the applicable defense to the murder charge. The explanatory instruction defining lawful force was a correct statement of the applicable law, and the trial court did not err by giving it.[11]
¶ 15 Slaughter argues that State v. Brightman[12] and State v. Callahan[13] required the trial court to give another, separate instruction on self-defense as a defense to the underlying assault on which the felony murder charge was predicated. This second self-defense instruction must, he argues, include the State's burden to disprove self-defense. We disagree. Nothing in these cases suggests that he is entitled to a separate *1088 self-defense instruction on the underlying assault. The charge was felony murder predicated on assault, not assault alone. The instructions the court gave already permitted Slaughter to argue his theory of the case: accidental homicide precipitated by an act of self-defense. They properly imposed the burden of proof on the State. Indeed, the instructions the trial court gave here were precisely what the court suggested in Brightman. Callahan does not require more.
¶ 16 In Brightman, the court suggests in a footnote that a self-defense instruction may be appropriate when the defense is excusable homicide if the defendant could argue that his action that precipitated the accidental killing amounted to nonhomicide self-defense. Specifically the court notes:
Excusable homicide is available as a defense only where the slayer is `doing any lawful act by lawful means.' RCW 9A.16.030. In turn, RCW 9A.16.020(3) establishes that the use of force is lawful when the person is about to be injured, so long as the force used is not more than necessary. Thus, a defendant could argue that his action that precipitated the accidental killing amounted to lawful self-defense under RCW 9A.16.020(3), even if he could not argue that an accidental killing was a justifiable homicide under RCW 9A.16.050.[[14]]
In accordance with this reasoning, the trial court here instructed the jury on the use of lawful force by giving modified WPIC 17.02, which contains the self-defense language set forth in RCW 9A.16.020(3).[15]
¶ 17 Callahan was a second degree assault case where the trial court refused to give a self-defense instruction because it was inconsistent with the defense of accident. There, the defendant displayed a gun to the victim and shot the victim's hand. But he claimed that the gun accidentally discharged when the victim tried to grab it.[16] On appeal, the court reversed and held that the defenses of accident and self-defense are not invariably inconsistent and mutually exclusive, and the defendant could assert both defenses if there was sufficient evidence to support the self-defense claim.[17] Unlike our case, Callahan involved neither a felony murder charge nor an excusable homicide defense; it involved only an assault charge where no self-defense instruction was given.[18] But here, the assault was the predicate to a homicide charge, and the issue raised by the defense was whether the homicide was an accident. The trial court gave the correct excusable homicide instruction and used the modified WPIC 17.02 to explain one of its terms. Unlike in Callahan, these instructions allowed Slaughter to argue his self-defense theory: that he was lawfully defending himself when he accidentally stabbed the victim. The self-defense instruction properly stated the State's burden to disprove the defense. That the jury did not agree with Slaughter's theory does not render the instructions erroneous.
¶ 18 The State relies on State v. Ferguson, which holds that "WPIC 17.02 can never be given in a felony murder case where assault is the predicate felony because it can never be reasonable to use a deadly weapon in a deadly manner unless the person attacked had reasonable grounds to fear death or great bodily harm."[19]Ferguson is not controlling because it was not an excusable homicide case and does not address the specific issues raised here. There, the defendant was charged with felony murder for stabbing the victim during a fistfight initiated by the victim, and the trial court refused to give a self-defense instruction for the assault which was the predicate offense for the felony murder.[20] The court affirmed on appeal, *1089 holding that the trial court properly gave a justifiable homicide instruction rather than a general self-defense instruction.[21]
¶ 19 The Ferguson court's statement that a WPIC 17.02 instruction can never be given when a felony murder charge is predicated on an assault contemplated a factual scenario not at issue here; i.e., one in which the defendant uses a deadly weapon in a deadly manner to repel an attack that did not reasonably create a fear of death or great bodily harm. Because he used excessive force, Ferguson could not claim that his use of force was reasonable to prevent injury. But under the facts here, Slaughter could argue that he reasonably used force to prevent injury: his theory was that Rosborough came at him with a knife and he reasonably responded with an assault (struggling over the knife), which resulted in an accidental stabbing death. Thus, the Ferguson holding does not address the issues raised by the self-defense claim asserted here. Rather, it underscores the self-defense principle that the use of deadly force is only reasonable if the defendant believed that death or great bodily harm was imminent.[22] The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. See RCW 2.06.040; CAR 14.
WE CONCUR: LAU, J., and SCHINDLER, C.J.
NOTES
[1] There was conflicting testimony as to why she went to her car. Evans testified that she said she needed to get something from her car; House testified that Slaughter came out of the room and told her to go start the car and he would be out shortly.
[2] State v. Jackman, 156 Wash.2d 736, 743, 132 P.3d 136 (2006).
[3] State v. Clausing, 147 Wash.2d 620, 626, 56 P.3d 550 (2002).
[4] State v. McCullum, 98 Wash.2d 484, 488, 656 P.2d 1064 (1983).
[5] Id. at 487-88, 656 P.2d 1064.
[6] State v. Brightman, 155 Wash.2d 506, 525, 122 P.3d 150 (2005).
[7] RCW 9A.16.030.
[8] RCW 9A.16.020(3).
[9] Brightman, 155 Wash.2d at 525 n. 13, 122 P.3d 150.
[10] Slaughter did not request this instruction.
[11] See RCW 9A.16.020(3).
[12] 155 Wash.2d 506, 122 P.3d 150 (2005).
[13] 87 Wash.App. 925, 943 P.2d 676 (1997).
[14] 155 Wash.2d at 525 n. 13, 122 P.3d 150.
[15] That statute provides that the use of force is not unlawful "[w]henever used by a party about to be injured, or by another lawfully aiding him or her, in preventing or attempting to prevent an offense against his or her person . . . in case the force is not more than is necessary." RCW 9A.16.020(3).
[16] Id.
[17] 87 Wash.App. at 932-33, 943 P.2d 676.
[18] Id. at 928, 943 P.2d 676.
[19] 131 Wash.App. 855, 862, 129 P.3d 856, review denied, 158 Wash.2d 1016, 149 P.3d 377 (2006).
[20] Id. at 857-59, 129 P.3d 856.
[21] 131 Wash.App. at 862, 129 P.3d 856.
[22] Id. at 861-62, 129 P.3d 856 (citing State v. Walden, 131 Wash.2d 469, 477-78, 932 P.2d 1237 (1997)).