**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON, ) No. 76912-0-I
)
      Respondent, )
) DIVISION ONE
      v. )
)
RICKY ARNTSEN, ) UNPUBLISHED OPINION
)
      Appellant. ) FILED: January 6, 2020
)

MANN, A.C.J. — Ricky Arntsen appeals his convictions for burglary in the first degree, assault in the second degree, burglary in the second degree, six counts of unlawful possession of a firearm, six counts of theft of a firearm, and malicious mischief in the first degree, based on three incidents over a span of two days. Arntsen contends the trial court erred in failing to instruct the jury that the State had the burden to disprove Arntsen's diminished capacity defense, and in granting the State's motion to join and then denying his motion to sever the charges for trial. Arntsen also contends that there was insufficient evidence to support his convictions for unlawful possession of a firearm and malicious mischief. Arntsen finally contends that the State committed prosecutorial misconduct during closing argument.

We reverse Arntsen's conviction for malicious mischief. We otherwise affirm.

I.

Arntsen was charged by amended information with 17 offenses arising out of three distinct incidents between December 1 and December 2, 2014.

Jackson Burglary

Davonya Jackson lived in an Auburn apartment with her two young children. At around 7:00 a.m. on December 1, 2014, Jackson's neighbor, Thomas Kelley, observed an older dark Jaguar enter the apartment complex. Kelley saw a man exit the car with what he described to police as an assault rifle. Kelley testified that the rifle "looked like an AK-47 with a banana clip," based on his prior military experience. Kelley watched the man walk to Jackson's apartment and kick in the front door. Kelley called 911.

Jackson was getting her children ready for school when a man, later identified as Arntsen, entered into her apartment with a rifle. Jackson described the man as a light skinned black man who was wearing "a light tan color jacket. He had something wrapped around his face, I don't know, a scarf or something around his face, dark jeans and some boots." Arntsen pointed the rifle at Jackson and kept asking "where is that Samoan bitch and where is Ricky Washington?" Jackson has a cousin named Dawn Jackson. Jackson was aware that a man named Ricky Washington was the father of Dawn's child. Jackson testified that she did not know Arntsen prior to the December 1 event.

After Jackson insisted there was nobody else there, Arntsen searched the apartment. He then forced Jackson into the parking lot at gunpoint, demanding that she show him "where they're at." Arntsen stated he was looking for a car, but Jackson

2

did not know what he was referring to. Eventually Arntsen walked away. Jackson then ran back to the apartment and called 911.

After giving her initial statement to the police Jackson went to her family's house in Kent. Jackson contacted her cousin Dawn and confirmed her association with Ricky Washington. Jackson then put her cousin Dawn in touch with the police.

Koenig Assault

Shortly thereafter, also on December 1, Kim Koenig was driving when she was forced off the road by a man driving an older, grayish Jaguar. Koenig testified that the man had a kerchief over his face, and he walked towards Koenig with a rifle. Koenig called 911. Koenig described the weapon as a hunting rifle, with "a regular metal barrel, but the stock on it was a wood grain. And it was a fair wood grain, it wasn't a dark, like black or anything like that."

After the man returned to the Jaguar and drove away, Koenig followed the car long enough to read its license plate number to the police dispatcher. The Jaguar was registered to Arntsen's mother, Cynthia Arntsen. Koenig noted that the man had a "slight wall-eyed look about his eyes."

Robert Morrill, a passing motorist, observed the incident. He saw a man jump out of an old, gray Jaguar. He saw the man carrying what he thought was an AK-47, which he identified from his own experience owning firearms. Morrill described the man as wearing a tan jacket and sunglasses.

Later that morning, police prepared and presented Jackson with a photo montage containing Arntsen's picture. Jackson identified Arntsen from the photo montage.

3

Big 5 Sporting Goods Burglary

The next day, on December 2, 2014, Arntsen drove a minivan through the front window and into a Big 5 Sporting Goods store. Arntsen then drove around inside the store. Arntsen, who was under the influence of methamphetamine, believed he was running over the people who were harassing him. Arntsen removed approximately 17 firearms from the display in the store, which were found in his van and on the floor. Ammunition that fit an AK-47 rifle was found in Arntsen's minivan at the Big 5. None of the 17 weapons removed by Arntsen were AK-47s or used AK-47 ammunition. Big 5 did not sell AK-47 ammunition.

Two police officers arrived on the scene and alerted the SWAT team. The SWAT team discovered Arntsen in the suspended ceiling and took him into custody forcibly. As police removed Arntsen from the store, he was "saying things that didn't make sense." Arntsen was wearing a tan jacket and dark pants, like the clothing described by witnesses in the previous incidents. Photographs from the scene showed Arntsen in a "stressed-out state" and with "bugged out" eyes.

After his arrest, police determined that Arntsen was not fit for jail and took him to Harborview Medical Center. He attempted to cut his restraints at the hospital. Arntsen kept talking about Ricky Washington.

After Arntsen's arrest at Big 5, police e-mailed Jackson a photograph of Arntsen taken at the scene of the arrest. Jackson recognized Arntsen as her assailant and she said she recognized the clothing Arntsen was wearing in the photograph.[1]

---

[1] This identification was initially excluded by the court during pretrial motions in limine. The court later ruled that Arntsen had opened the door by questioning Jackson regarding the photograph. The court then permitted testimony about Jackson's identification of Arntsen using the Big 5 photograph, but

4

B.

Arntsen was charged with burglary in the first degree for the Jackson incident, assault in the second degree and felony harassment in the Koenig incident, and burglary in the second degree, six counts of unlawful possession of a firearm, six counts of theft of a firearm, and malicious mischief in the first degree, for the Big 5 incident. At trial, Arntsen represented himself pro se. The court provided him with standby counsel after the trial began.

Originally, the Jackson and Big 5 burglaries were filed separately. Prior to trial, the State amended the information, adding the Koenig assault to the Jackson burglary, and simultaneously moved to consolidate all three events for trial. Over Arntsen's objection, the trial court granted the State's motion to join all of the charges. During pretrial motions, Arntsen moved to again sever the charges. The trial court denied the motion to sever.

Arntsen's defense to the Jackson incident was denial, and that Jackson's identification of him was tainted by her conversation with her cousin Dawn. Arntsen's defense to the Koenig incident was that he was not identified. Arntsen's defense to the Big 5 incident was based on diminished capacity. He had two mental health experts explain how the mental health disorders, heavy drug use, and lack of sleep diminished his capacity. One expert diagnosed Arntsen with bipolar disorder with dependent and antisocial negativistic personality features. The second expert diagnosed him with paranoia, schizophrenia, anxiety, anti-social behavior disorder, and poor judgment and coping skills.

---

continued to exclude the photograph. After Jackson acknowledged that she saw Arntsen in the news, her in-court identification was also suppressed.

5

The jury acquitted Arntsen of felony harassment, but convicted him of all the other charges.

## II.

Arntsen requested the jury be instructed that it was the State's burden to disprove his defense of diminished capacity beyond a reasonable doubt. The court declined the requested instruction, instead instructing the jury that "[e]vidence of mental illness or disorder may be taken into consideration in determining if the defendant had the capacity to form intent, knowledge, or malice." Arntsen argues that the jury instructions given by the court did not correctly allocate the burden of proof to the government. We disagree.

This court reviews jury instructions de novo, within the context of the jury instructions as a whole. State v. Slaughter, 143 Wn. App. 936, 941, 186 P.3d 1084 (2008). "Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law." Slaughter, 143 Wn. App. at 941. Errors in jury instructions that shift the burden of proof to a criminal defendant may implicate a defendant's right to due process, which makes them errors of constitutional magnitude. Slaughter, 143 Wn. App. at 941-42.

Diminished capacity is a defense when an element of the crime charged is specific intent or knowledge. State v. Thomas, 123 Wn. App. 771, 779, 98 P.3d 1258 (2004). "If specific intent or knowledge is an element, evidence of diminished capacity can then be considered in determining whether the defendant had the capacity to form the requisite mental state." Thomas, 123 Wn. App. at 779. "Diminished capacity allows

a defendant to undermine a specific element of the offense, a culpable mental state, by showing that a given mental disorder had a specific effect by which his ability to entertain that mental state was diminished." State v. Clark, 187 Wn.2d 641, 650, 389 P.3d 462 (2017).

In State v. Marchi, 158 Wn. App. 823, 833, 243 P.3d 556 (2010), the defendant was charged with attempted first degree murder and first degree assault of a child after she gave her daughter a potent drug cocktail. The defendant argued that she did not have the requisite intent to commit the offenses due to diminished capacity. Marchi, 158 Wn. App. at 828. The trial court in Marchi gave the identical pattern instruction given in Arntsen's case. Marchi, 158 Wn. App. at 834. The jury was instructed "that the State had the burden to prove each element of the charged crimes beyond a reasonable doubt." Marchi, 158 Wn. App. at 834. The trial court did not instruct the jury that the State had to disprove Marchi's diminished capacity claim. Id. 158 Wn. App. at 834. As in this case, the defendant argued on appeal that the instructions should have expressly required the State to disprove diminished capacity. Id. at 833.

Division Two of this court rejected the defendant's position, noting that "diminished capacity is [not] a complete defense but, rather, is evidence the jury may take into account when determining whether the defendant could form the requisite mental state to commit the crime." Marchi, 158 Wn. App. at 836. The court held:

> the trial court's instructions clearly and unambiguously allocated to the State the burden of proving the crimes beyond a reasonable doubt. The jury instructions sufficiently informed the jury that the State had the burden of proving Marchi's intent beyond a reasonable doubt. And the trial court instructed the jury that it could consider her mental illness or disorder when deciding if the State proved that she acted with the requisite intent. We find no error in the trial court's instruction.

Marchi, 158 Wn. App. at 836.

7

Arntsen argues that Marchi is no longer good law after the Supreme Court's decision in State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014), and Division Two of this court's decision in State v. Imokawa, 4 Wn. App. 2d 545, 422 P.3d 502 (2018). Imokawa, however, was more recently reversed. State v. Imokawa, 194 Wn.2d 391, 450 P.3d 159 (2019). Neither W.R., nor Imokawa support Arntsen's position.

At issue in W.R. was whether, in a rape prosecution, the defendant was required to prove the defense of consent by a preponderance of the evidence. W.R., 181 Wn.2d at 760. The Supreme Court held that when consent necessarily negates an element of the crime, it violates due process to place the burden of proof on the defendant. Id. at 766-67. The Court explained that if a defense "necessarily negates an element of the crime, it violates due process to place the burden of proof on the defendant." Id. at 765. "The key to whether a defense necessarily negates an element is whether the completed crime and the defense can coexist." Id. at 765. When the defense necessarily negates the element of a crime charged, the State cannot shift the burden of proof of the defense onto the defendant. Otherwise, the State would be relieved of its burden of proving every element of the crime beyond a reasonable doubt. Id. at 770-71.

W.R. did not, however, require an instruction indicating that the State must disprove consent. Rather, it required the State to prove forcible compulsion. Id. at 766-67. Indeed, the Court expressly stated that an instruction requiring the State to disprove consent was not needed:

> Because the focus is on forcible compulsion, jury instructions need
> only require the State to prove the elements of the crime. It is not
> necessary to add a new instruction on consent simply because evidence
> of consent is produced.

W.R., 181 Wn.2d at 774, n.3.

Here, because the instructions did not require Arntsen to prove diminished capacity, but instead instructed the jury that the State had the burden to prove the elements of the crime, including intent, W.R. does not support Arntsen's position.

In Imokawa, the Supreme Court addressed whether a failure to instruct the jury that the State had the burden of proving the absence of a superseding intervening cause violated due process. The State charged Imokawa with vehicular homicide and vehicular assault resulting from a collision. Imokawa claimed that actions taken by the victim were an intervening superseding cause. The trial court denied Imokawa's request to include a specific instruction that the State must prove the absence of an intervening cause. Imokawa argued that it violated due process when the jury is not explicitly instructed that the State must prove absence of a defense. Imokawa, 194 Wn.2d at 401. The Court of Appeals agreed that the State had the burden of proof and that the jury was not adequately instructed on that burden and reversed. The Supreme Court disagreed, and held:

> The trial court did not need to explicitly instruct the jury that the State has the burden to prove absence of superseding intervening cause because, as instructed, proximate cause and presence of a superseding intervening cause are mutually exclusive. This means proof of proximate cause beyond a reasonable doubt necessarily proves absence of a superseding intervening cause.

Imokawa, 194 Wn.2d at 402. The Court concluded that where "the jury is instructed as to the statutory elements of a crime, that the State bears the burden of proving all elements beyond a reasonable doubt, and that the defendant has no burden of proof, the instructions as a whole are constitutionally adequate and do not violate due process." Imokawa, 194 Wn.2d at 403-04.

9

Similar to Imokawa, the State did not have the burden to disprove Arntsen's diminished capacity. The jury was instructed that the State had the burden to prove each of the elements of the crimes, including intent, beyond a reasonable doubt. The jury was also instructed that it could consider Arntsen's mental illness or disorder when deciding if the State proved that he acted with the requisite intent. The jury's finding that Arntsen had the requisite intent demonstrates that the jury did not find the evidence of diminished capacity persuasive enough to show that he lacked the requisite intent.

The trial court did not err in declining to instruct the jury that the State had the burden of disproving diminished capacity.

III.

Arntsen argues next that the trial court abused its discretion when it granted the State's motion to join the three incidents and later denied Arntsen's pretrial motion to sever. We disagree.

A.

Joinder is concerned with the propriety of joining separate offenses in a single charging document. CrR 4.3(a) permits the joinder of multiple offenses when the various crimes "(1) [a]re of the same or similar character, even if not part of a single scheme or plan," or "(2) [a]re based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan." The joinder rule should "be construed expansively to promote the public policy of conserving judicial and prosecutorial resources." State v. Bryant, 89 Wn. App. 857, 864, 950 P.2d 1004 (1998). Whether multiple offenses are properly joined is a question of law subject to de novo review. Bryant, 89 Wn. App. at 864. We determine the validity of the joinder based

10

solely on the allegations in the charging information. "If joinder was not proper but offenses were consolidated in one trial, the convictions must be reversed unless the error is harmless." Bryant, 89 Wn. App. at 864.

As the trial court explained in its order granting joinder:

> The incidents involved here took place over a period of approximately 24 hours. During two of the incidents, the defendant stated that he intended to kill "Ricky Williams." He began by kicking in Ms. Jackson's door and demanding to know where he could find Mr. Williams. A very short time later, defendant, wearing the same clothes and driving the same car, threatened another woman with a rifle. The following day, the defendant drove a minivan into a sporting goods store in an attempt to steal several weapons. He once again stated that he planned to "kill Ricky Washington." The incidents are all close in time and are part of a series of acts that are closely connected.

We agree. This evidence in the three crimes demonstrated a connection of time, proximity, motive, and evidence. Because the State demonstrated a material connection between the offenses, joinder was proper in this case.

B.

Where joinder is proper, the offenses shall be consolidated for trial, "but the trial court may sever the offenses if doing so will promote a fair determination of the defendant's guilt or innocence of each offense, considering any resulting prejudice to the defendant." Bryant, 89 Wn. App. at 864; citing CrR 4.4. A trial court's failure to sever counts is reversible only upon a showing that the court's decision was a manifest abuse of discretion. State v. Bythrow, 114 Wn.2d 713, 717, 790 P.2d 154 (1990).

To determine whether to sever a case, the court considers: "(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial." State v. Sutherby, 165

11

Wn.2d 870, 884-85, 204 P.3d 916 (2009). We review only the facts known to the trial judge at the time, rather than the events that develop later at trial. State v. Bluford, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017). Defendants seeking severance must demonstrate that a trial involving multiple counts would be so manifestly prejudicial as to outweigh the concern for judicial economy. Bythrow, 114 Wn.2d at 718.

We analyze each factor in turn.

(1) The strength of the State's evidence on each count

Severance is proper when one case is remarkably stronger than the other. State v. MacDonald, 122 Wn. App. 804, 815, 95 P.3d (2004). Here, the evidence supporting the Jackson burglary, Koenig assault, and Big 5 burglary is of roughly equal strength when considering the cross admissibility of the evidence. Arntsen conceded the Big 5 robbery; he contested only the intent element based on his claim of diminished capacity. The evidence of the Jackson burglary was strong if Jackson's identification of Arntsen was credible. The Koenig assault occurred within an hour of the Jackson burglary on a nearby roadway while Arntsen was driving the same car identified at the Jackson burglary—a car registered to his mother.

(2) The clarity of defenses as to each count

Joinder prejudices a defendant if the defendant's ability to clearly present multiple defenses to a jury is disrupted. State v. Cotten, 75 Wn. App. 669, 687, 879 P.2d 971 (1994). "Prejudice may result from joinder if the defendant is embarrassed in the presentation of separate defenses." State v. Russell, 125 Wn.2d 24, 62, 882 P.2d 747 (1994). To demonstrate prejudice, the defenses must be "conflicting to the point of being irreconcilable and mutually exclusive." State v. Medina, 112 Wn. App. 40, 53, 48

12

P.3d 1005 (2002). Even the presence of mutually antagonistic defenses is not alone sufficient to compel separate trials. Id. The defendant must demonstrate that the conflict is so prejudicial that a jury would unjustifiably infer this conflict alone demonstrates guilt on all charges. Id.

Arntsen asserted general denial as his defense to the Jackson burglary and Koenig assault, claiming that the events were either fabricated or that he was misidentified. Arntsen's defense to the Big 5 burglary was diminished capacity and necessity. These defenses do not reach the level of being irreconcilable. A reasonable juror could have concluded that the identification of Arntsen as the perpetrator of the Jackson burglary and Koenig assault was inadequate while also concluding that the evidence was sufficient to prove that he had committed the Big 5 burglary and that he had the capacity to form the requisite intent to commit that crime. Arntsen has thus not established prejudice in the presentation of his defenses.

### (3) Court instructions to the jury to consider each count separately

Jury instruction 19 instructed the jury that each count was separate and the jury must consider each crime separately. In Cotten, 75 Wn. App. at 688, this court found that this limiting instruction ameliorated any prejudice that may have resulted from joinder of the charges.

### (4) The admissibility of evidence of the other charges

Joinder is generally not prejudicial when evidence of one crime is admissible to prove the elements of another. State v. Weddel, 29 Wn. App. 461, 465, 629 P.2d 912 (1981). ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

13

It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence of the defendant's bad acts may be admitted under ER 404(b) to show identity if: the evidence is logically relevant to the issue of identity, identity is a material issue before the jury, and the probative value of the evidence outweighs its potential for prejudice. State v. Hall, 40 Wn. App. 162, 165, 697 P.2d 597 (1985).

Here, the evidence of Arntsen's involvement in all three crimes was relevant and thus cross admissible to prove Arntsen's identity. Identity was Arntsen's defense to the Jackson and Koenig incidents and the State demonstrated that the evidence linked Arntsen to these crimes. Washington was a critical link between the Jackson burglary and Big 5 Burglary, and helped establish Arntsen's identity in the Jackson incident. Witnesses to the Jackson and Koenig incidents described the assailant as wearing the same clothing that Arntsen was wearing when he was apprehended at the Big 5 store. Additionally, Koenig described her assailant's "bugged-out eyes," which matched Arntsen's appearance at the Big 5 scene.

Witnesses to the Jackson and Koenig incidents described the assailant's car as a dark, older Jaguar. Koenig's report of the license plate number confirmed that the Jaguar belonged to Arntsen's mother. Finally, witnesses to the Jackson and Koenig incidents described the assailant as carrying an AK-47 assault rifle. Cartridges that fit AK-47 assault rifles were found in Arntsen's minivan at Big 5.

In summary, the critical evidence for essential elements of the crimes was dispersed through the three crimes, demonstrating that the three incidents were inextricably linked by the evidence. Arntsen did not demonstrate that he was so

14

manifestly prejudiced by joinder that this prejudice outweighed the court's concern for judicial economy.

The trial court did not err by joining the offenses and did not manifestly abuse its discretion when subsequently denying Arntsen's motion for severance.

IV.

Arntsen next argues that the State failed to prove that he committed the Jackson burglary and Koenig assault while possessing a deadly weapon. Arntsen argues that since the gun was never discharged or recovered, the gun-like object could have been a toy replica or a pellet gun. Arntsen relies on the testimony of his expert witness who testified that without more information, he could not distinguish between an actual rifle, a pellet gun, or a toy. But the eye witness testimony established that Arntsen was armed with a real gun.

> The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.

State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The first degree burglary and second degree assault charges require that the State prove that Arntsen was armed with a deadly weapon. The State must present sufficient proof that the person possessed an actual deadly weapon, not a toy. State v. Tongate, 93 Wn.2d 751, 755, 613 P.2d 121 (1980). The State is not required to prove that the firearm was operable at the time of the offense under former RCW 9.41.010(9), which defines firearm. State v. Olsen, No. 51531-8-II, slip op. at 7-8 (Wash. Ct. App. Oct. 8, 2019). The evidence is sufficient if a witness to the crime testified to the

15

presence of a weapon. Tongate, 93 Wn.2d at 754. "The evidence may be circumstantial; no weapon need be produced or introduced." Tongate, 93 Wn.2d at 754.

In Tasker, this court held that the State presented sufficient evidence that the defendant used a gun "in fact," rather than a "gunlike but nondeadly object," even though the firearm was never recovered. State v. Tasker, 193 Wn. App. 575, 595, 373 P.3d 310 (2016). This conviction was based on the victim's description of a "real gun" and the clicking noise she heard. Tasker, 193 Wn. App. at 595.

> While she forthrightly admitted to little experience with guns "in real life," she was old enough, as the mother of a middle schooler, to have seen guns in photographs, on the news, in television programs and in movies. The clicking noise she described hearing behind her head was consistent with Mr. Tasker's use of a real gun. Collectively, the evidence was sufficient to establish the gun met the definition of a "firearm" under RCW 9.41.010(9).

Tasker, 193 Wn. App. at 595. This court confirmed that "eyewitness testimony that described a gun as appearing real was sufficient to support a jury finding that an offender was armed with a firearm." Tasker, 193 Wn. App. at 587-88.

In Mathe, the State used witness testimony to establish that the defendant had a deadly weapon. State v. Mathe, 35 Wn. App. 572, 580, 668 P.2d 599 (1983). The weapons were never recovered. Mathe, 35 Wn. App. at 580. The court found that

> a rational trier of fact could have found beyond a reasonable doubt that Mathe used a real and operable gun during the two robberies. While evidence of the deadly weapon and firearm was circumstantial, "[i]n determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence.

Mathe, 35 Wn. App. at 581-82.

16

This case is analogous to Tasker and Mathe. Here, multiple witnesses testified that the suspect was armed with an AK-47. Kelley identified the suspect as carrying an AK-47 near Jackson's apartment. Kelley was familiar with AK-47s through his service in the Vietnam War. During the Koenig incident, Morrill witnessed the suspect with an AK-47. Morrill recognized the AK-47 as such through his own experience with guns. Finally, cartridges that fit AK-47 rifles were found in Arntsen's minivan at Big 5. None of the 17 firearms stolen from Big 5 used these cartridges, and Big 5 did not sell this type of ammunition. This evidence is sufficient to demonstrate that the gun was a gun "in fact."

Viewing the evidence in the light most favorable to the State, sufficient evidence supports the jury's finding that Arntsen had a deadly weapon.

IV.

To convict Arntsen of first degree malicious mischief, the jury was required to find that he caused damage exceeding $5,000 to the Big 5 store. Arntsen contends that the State failed to establish that the damage caused to the Big 5 exceeded $5,000. We agree.

Here, Erin Russo, the Big 5 manager who testified about the damage did not estimate the value of the damage to the store. The State presented no evidence of the monetary value of the damage. Although photographs depict a serious amount of damage, the State provided no authority that would have allowed the jury to decide the damage value based on photographs alone.

We agree with Arntsen there was insufficient evidence to demonstrate that the damage to the Big 5 store exceeded $5,000.

17

V.

Arntsen next contends that the prosecutor committed misconduct during closing arguments preventing Arntsen from receiving a fair trial. We disagree.

Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). "When reviewing a claim that prosecutorial misconduct requires reversal, the court should review the statements in the context of the entire case." State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). The reviewing court first considers whether the prosecutor's comments were improper; and if so, whether the improper comments caused prejudice. Lindsay, 180 Wn.2d at 431. To show prejudice, the defendant must show a substantial likelihood that the prosecutor's statements affected the jury verdict. Lindsay, 180 Wn.2d at 440.

A.

Arntsen first argues that the prosecutor committed misconduct by describing his arguments as being pulled out of "thin air" during rebuttal closing, thus denigrating his role as defense counsel.

"[A] prosecutor must not impugn the role or integrity of defense counsel." Lindsay, 180 Wn.2d at 431-32. A prosecutor may, however, attack the evidentiary basis, or lack thereof, for a defendant's theory of the case. State v. Killngsworth, 166 Wn. App. 283, 291-92, 269 P.3d 1064 (2012); Lindsay, 180 Wn.2d at 431. Because Arnsten failed to object or request a curative instruction, we review the prosecutor's comments to determine if they were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Lindsay, 180 Wn.2d at 430.

18

During closing rebuttal, the prosecutor argued:

Ladies and gentleman, the defendant's closing reminds me of an old saying, and that it's easy to pull things out of thin air. Seriously. It's easy to pull things out of thin air.

The prosecutor returned to this theme several times, using the word "thin air" three more times. Arntsen analogizes these comments to Thorgerson, where the prosecutor used words of dishonesty, like "bogus," and "sleight of hand," to disparage defense counsel and impugn defense counsel's integrity. Thorgerson, 172 Wn.2d at 451-52.

When reviewing the prosecutor's comments in the context of the closing argument, it is clear that the intent of the prosecutor was to implore the jury to rely on the evidence. For example, one of the prosecutor's full statements was "the task that you have and the difficulty that you have is sifting through all that stuff that the defendant so easily pulls out of the air, and looking at the evidence that was presented in the case and the facts that are in evidence before you."

Because the prosecutor's statements were intended to demonstrate that the evidence did not support Arntsen's argument, rather than to impugn Arntsen, these statements did not constitute misconduct.

B.

Arntsen next contends the prosecutor committed error by misstating the law on the crime of unlawful possession of a firearm. A prosecutor's arguments during closing argument must be confined to the law stated in the trial court's instructions. State v. Walker, 164 Wn. App. 724, 736, 265 P.3d 191 (2011) (citing State v. Estill, 80 Wn.2d 196, 199, 492 P.2d 1037 (1972)). A prosecutor's misstatement of the law creates a

19

substantial likelihood that the misstatement influenced the jury verdict and denied the defendant a fair trial. Walker, 164 Wn. App. at 736.

Here, Arntsen argues that the prosecutor suggested that simple possession was sufficient to establish that he unlawfully possessed firearms in the Big 5 store.

The prosecutor explained,

> if you pick something up and we can establish you intended to permanently—you intended to deprive another person of it, you picked it up, the theft is done. That's it. You've committed the crime of theft. You don't have to like, Well, I'm going to walk outside, I'm going to do this today. Once you establish control over that item, you have possessed it.

The prosecutor's statement does not contradict jury instruction 40, which defined possession of a firearm as:

> Possession means having a firearm in one's custody or control. It may be either actual or constructive. Actual possession occurs when the weapon is in the actual physical custody of the person charged with possession. Constructive possession occurs when there is no actual physical possession but there is dominion and control over the item.

> In deciding whether the defendant had dominion and control over an item, you are to consider all the relevant circumstances in the case. Factors that you may consider, among others, include whether the defendant had the immediate ability to take actual possession of the item and whether the defendant had the capacity to exclude others from possession of the item. No single one of these factors necessarily controls your decision.

The prosecutor's statement did not misstate the law and therefore did not constitute prosecutorial misconduct.

## C.

Arntsen argued at trial that breaking into the Big 5 store to steal firearms was necessary to protect himself from being victimized by Ricky Washington, whom Arntsen allegedly believed intended to harm him. He contends on appeal that the prosecutor

20

misled the jury by arguing that the burglary was not necessary because Arntsen could have gone to "a gun show and [bought] a firearm or [got] one from his friends,"—both being reasonable, legal alternatives to breaking into Big 5. Arntsen argues that this statement was improper because the prosecutor knew he could not legally purchase a firearm because of a prior felony conviction.

We agree with Arnsten that the prosecutor's comment was not appropriate because buying the guns from a gun show or getting a gun from friend was not a "reasonable legal alternative." But even if the comment was improper, Arnsten cannot demonstrate prejudice. Lindsay, 180 Wn.2d at 431.

In order to demonstrate necessity, the defendant must prove that "(1) they reasonably believed the commission of the crime was necessary to avoid or minimize a harm, (2) the harm sought to be avoided was greater than the harm resulting from a violation of the law, (3) the threatened harm was not brought about by the defendant, and (4) no reasonable legal alternative existed." State v. Ward, 8 Wn. App. 2d 365, 372, 438 P.3d 588 (2019). In order to prove necessity as a defense to unlawful possession of a firearm, the defendant must prove, among other factors, that they "reasonabley believed [they] or another was under unlawful and present threat of death or serious physical injury." State v. Parker, 127 Wn. App. 352, 354, 111 P.3d 1152 (2005). There was no such evidence presented to the jury. At best, Arntsen testified only that he was obtaining weapons to protect himself against a future harm that might occur at some unknown time and place.

Thus, while the prosecutor's comment may have been improper, it was not prejudicial and was not prosecutorial misconduct.

21

VI.

Arntsen argues that cumulative error denied him a right to a fair trial. We disagree.

"Cumulative error may call for reversal, even if each error standing alone would be considered harmless." Thorgerson, 172 Wn.2d at 454 (citing State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006)). The doctrine does not apply, however, "where the defendant fails to establish how claimed instances of prosecutorial misconduct affected the outcome of the trial or how combined claimed instances affected the outcome of the trial." Thorgerson, 172 Wn.2d at 454.

Here, we are reversing the malicious mischief charge due to insufficient evidence. However, Arntsen has not demonstrated that he was denied a fair trial. Arntsen has not established that the jury instructions warranted a reversal. Joinder was proper in this case. The prosecutor did not conduct misconduct in closing arguments. Because Arntsen has not established errors in these instances, or established how these claimed instances affected trial, his argument for cumulative error fails.

VII.

Arntsen raises additional issues in multiple lengthy statements of additional grounds (SAG). A defendant may submit SAG for review pursuant to RAP 10.10. However, "[an] appellate court will not consider a defendant/appellant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). Furthermore, we only consider arguments that are not repetitive of briefing. RAP 10.10(a). Finally, issues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not a

statement of additional grounds. State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). We have considered all of the issues raised by Arnsten, and address two in depth here.

A.

Arntsen argues that there was insufficient evidence to prove the make, model, caliber, and specific features of the firearms for the six counts of theft of a firearm, and the six unlawful possession of a firearm counts from Big 5. We disagree.

> The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.

State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Arnsten contends that there was insufficient evidence to demonstrate that the weapons recovered were the weapons identified in each of the jury instructions. Each of the instructions named the specific weapon Arntsen was charged with possessing. For example, instruction 34 was: "each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on or about December 2, 2014, the defendant knowingly had a firearm, a Savage .223 bolt action rifle, in his possession or control."

The State offered the testimony of Erin Russo, the manager of Big 5, to confirm that the weapons matched those found in Big 5 inventory records and matched the serial numbers of weapons found in Arntsen's van. Arnsten argues that the trial court

erred in permitting Russo to read from the store's inventory list. Arntsen's argument fails for two reasons.

First, Arntsen did not object to any of this testimony. We may refuse to review any claimed error that was not raised in the trial court. RAP 2.5(a); State v. Robinson, 171 Wn.2d 292, 304-05, 253 P.3d 84 (2011) (issue preservation rules encourage "the efficient use of judicial resources . . . by ensuring that the trial court has the opportunity to correct any errors, thereby avoiding unnecessary appeals") (internal quotation omitted).

Second, the prosecutor asked Russo if he was familiar with the Big 5 inventory records and whether those records were maintained in the ordinary course of the store's business. Russo confirmed that he was familiar with these business records. Under RCW 5.45.020:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

The information Russo provided the jury was properly admitted as records of weapons in Big 5's inventory under this statute.

When viewing the evidence in the light most favorable to the State, based on Russo's testimony, any rational trier of fact could have found that the firearms identified in each of the firearm theft and possession jury instructions were the same firearms found in Arnsten's vehicle and matching the Big 5 inventory. Salinas, 119 Wn.2d at 201.

24

B.

Arntsen argues next that when a diminished capacity instruction is given, a voluntary intoxication instruction is not necessary, and the trial court erred by giving the voluntary intoxication instruction. We disagree.

The authority that Arntsen presented to the court is not in the record. Arntsen objected to the voluntary intoxication instruction after the jury began deliberating. The court determined that this motion was untimely and properly denied. There was ample evidence presented about voluntary including Arnsten's testimony that before he drove into the Big 5 he was "sitting here smoking—smoking meth. And then I would doze off a little bit, and then I wake up and I smoke some more meth, and I doze off a little bit." The State requested the instruction for the jury so that the jury would be able to properly evaluate how voluntary intoxication effects the defendant's mental state.

The trial court did not err when it included the voluntary intoxication instruction.

We reverse the malicious mischief in the first degree conviction on the basis of insufficient evidence, we otherwise affirm.

_Mann, ACJ_

WE CONCUR:

_Andrus, J._

_Appelwick, CJ_

25